# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-12-00205-CV

Brad Livingston, in his Official Capacity as the Executive Director of the
Texas Department of Criminal Justice, Appellant

v.

Laura Beeman and Janet Lock, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT
NO. D-1-GN-10-000515, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

Chapter 121 of the Texas Human Resources Code requires that "[p]ersons with disabilities have the same right as the able-bodied to the full use and enjoyment of any public facility in the state," including the right to use an "assistance animal . . . or other device of assistance," to "reasonable accommodations in policies, practices, and procedures," and to have "auxiliary aids and services necessary to allow the full use and enjoyment of the public facility." Tex. Hum. Res. Code § 121.003(a), (c), (d)(2), (3); *see generally id.* §§ 121.001–.011. The pivotal issue in this appeal—one of first impression in this state—is whether prison facilities operated by the Texas Department of Criminal Justice (TDCJ) are among the "public facilities" to which chapter 121's requirements apply. We conclude they are not.

**BACKGROUND**

Appellees Laura Beeman and Janet Lock are inmates in a TDCJ prison facility.[1] Both are deaf. While both can read or write in English to some degree, their preferred method of communication is American Sign Language, "a visual, three-dimensional, non-linear language" whose "grammar and syntax differ from the grammar and syntax of English and other spoken languages."[2]

Complaining that TDCJ had failed to provide assistive devices necessary for them to use a new phone system at their prison, or competent sign-language interpreters to assist them during various prison procedures and activities, appellees sued the TDCJ's executive director, Brad Livingston, in his official capacity (Livingston), seeking declarations that TDCJ was violating their rights under chapter 121 of the human resources code and injunctive relief compelling TDCJ to remedy the asserted violations. *See* Tex. Hum. Res. Code §§ 121.001–.011; Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code §§ 37.001–.011.[3] Appellees alleged that they

---

[1] Lock is serving a ten-year sentence for aggravated sexual assault of a child, while Beeman is serving a 25-year sentence for causing serious bodily injury to a child—her own infant son—with a deadly weapon.

[2] *Equal Emp't Opportunity Comm'n v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010).

[3] The plaintiffs originally included two other deaf TDCJ inmates, Leslie Arrington and Kathy Williams, who have since been released from prison, rendering their claims moot. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). Accordingly, while Arrington and Williams were originally named as appellees, we dismissed this cause as to them on the appellees' unopposed motion. *See Livingston v. Arrington*, No. 03-12-00205-CV, 2012 WL 6764069, at *1 (Tex. App.—Austin Dec. 28, 2012, order) (per curiam). Similarly, while the plaintiffs originally purported to sue on behalf of a putative class of similarly situated deaf TDCJ inmates, the district court ultimately denied class certification, and appellees have not challenged that ruling on appeal. Consequently, only appellees' individual claims remain at issue.

were "persons with disabilities" protected by chapter 121, that the TDCJ prison where they were housed was a "public facility" to which chapter 121 applies, and that TDCJ had failed to make "reasonable accommodations in policies, practices, and procedures" or to "provide auxiliary aids and services necessary to allow [them] the full use and enjoyment of the public facility" as chapter 121 required. *See id*. §§ 121.002(4), (5), .003(d)(2), (3). Appellees also prayed for attorney's fees and costs as the UDJA permitted. *See* Tex. Civ. Prac. & Rem. Code § 37.009. Appellees relied solely on claims under Texas state law and did not attempt to seek relief under federal disability discrimination prohibitions, such as the Americans with Disabilities Act (ADA).[4]

Livingston interposed a plea to the jurisdiction, asserting that appellees' official-capacity claims against him were barred by sovereign immunity and that nothing in chapter 121 waived that immunity. Following a hearing, the district court denied the plea.

Meanwhile, appellees had sought a temporary restraining order, and then a temporary injunction, that would compel Livingston to provide them assistive devices enabling them to use the inmate phone system in a manner they deemed equivalent to inmates who could hear. The contract for installation of TDCJ's new inmate phone system had called for the provision of telecommunications devices for the deaf (TDDs), also known as teletypewriters or text telephones (TTYs), devices that enables users to transmit typed messages in some language capable of

---

[4] *See generally* 42 U.S.C.A §§ 12101–12213 (West 2013). However, the plaintiffs did assert some additional claims under Texas law. They asserted claims predicated on alleged violations of chapter 121 against two other defendants—the Texas Board of Pardons and Paroles and the contractor that had allegedly installed the prison phone system—plus claims against all three defendants predicated on alleged violations of the Texas Architectural Barriers Act, *see* Tex. Gov't Code §§ 469.001–.208, and a breach-of-contract claim solely against the contractor. The final judgment, as indicated below, ultimately awarded relief based exclusively on violations of chapter 121, and appellees do not complain of this on appeal.

3

written expression (e.g., English) in lieu of voice communications.[5]  At the inception of their suit, appellees had complained that the TDDs required under the contract had not been made available to them yet, and pled that *either* these devices or video phones—a technologically more advanced substitute for telephone voice communications that, unlike TTYs, permitted conversations in sign language[6]—would suffice as "reasonable accommodations" under chapter 121.  The TTYs had eventually been made available to appellees, but thereafter further controversy had arisen after appellees had demanded and been refused the right to use those devices in conjunction with a relay service, a process that would enable them to communicate via TTY with persons who did not have a TTY at their end of the line.[7]  But appellees' primary focus in litigating access to the prison phone system became the championing of video phones, as opposed to the "obsolete" TTY technology, as the *sole* means by which TDCJ could satisfy chapter 121.

Although the district court denied appellees' request for a TRO, it granted them a temporary injunction compelling Livingston to immediately provide access to a relay service in

---

[5]  A TTY contains a QWERTY keyboard and a small screen that displays messages that are typed or received.  The device converts typed characters into electronic tones that can be sent across standard telephone lines to another TTY, which converts the sound back into digital type.

[6]  A video phone is a telephone with an integrated camera and video monitor.  The camera captures a video signal of the caller, which is carried over high-speed broadband internet lines and is then displayed on the recipient's video monitor, and vice versa.

[7]  In a typical relay service, a deaf individual contacts a live relay operator, either via TTY or video phone.  The relay operator then uses a separate telephone to contact the deaf person's intended hearing recipient.  Once connected to both parties, the deaf individual sends a message to the relay operator via TTY or videophone.  The operator then "relays" communications between the two parties. *See Sorenson Commc'ns, Inc. v. Federal Commc'ns Comm'n*, 659 F.3d 1035, 1039 (10th Cir. 2011) (discussing videophone relay services); *id*. at 1039 n.1 (discussing text relay services).

conjunction with TTYs, subject to certain security precautions.[8]  The district court further ordered

Livingston "to continue to explore ways to provide reasonable accommodations for inmates with

hearing disabilities" and, specifically, "to investigate ways to implement the use of videophone

technology . . . ."

Livingston perfected an interlocutory appeal from the temporary injunction,

but the suit proceeded to a bench trial on the merits of appellees' claims.  During trial, Livingston

unsuccessfully reurged his jurisdictional challenge.  At the conclusion of evidence, the district court

rendered a final judgment awarding appellees declaratory and injunctive relief, plus approximately

$225,000 in attorney's fees and costs under the UDJA.  The judgment declared that Livingston had

"unlawfully discriminated against [appellees] in violation of Chapter 121 of the Texas Human

Resources Code by failing to make reasonable accommodations for [appellees] in TDCJ's policies,

practices, and procedures and failing to provide auxiliary aids and services."  *See* Tex. Hum. Res.

Code § 121.003(d)(2) ("The discrimination prohibited by this section includes . . . a failure to . . .

make reasonable accommodations in policies, practices, and procedures"), (3) (. . . or "provide

auxiliary aids and services necessary to allow the full use and enjoyment of the public facility").  It

enjoined Livingston to "provide [appellees] access to a videophone and relay service on the same

basis that hearing prisoners have access to telephones," plus "access to a TTY and the relay service

so they may place calls to people in the free world who use videophones."  The district court further

enjoined Livingston to provide "qualified sign language interpreters" for appellees, whether in

_____

[8] Although the order denying appellees' TRO request was signed by the same judge who ultimately signed the final judgment, the Hon. Stephen Yelenosky, the temporary injunction was signed by a different Travis County district judge, the Hon. Lora Livingston (who is not to be confused with appellant Livingston).

5

person or remotely by video connection, at "all disciplinary hearings;" "all grievance proceedings, including interviews, investigations, and communications regarding grievances;" "job training;" "any prison orientation the prisoner is required to or permitted to attend;"[9] "all educational classes, religious services, and rehabilitation programs offered at the prison (such as Alcoholics Anonymous and Narcotics Anonymous);" and also "upon the request of [appellees] to facilitate communication with prison staff."

The district court subsequently made findings of fact and conclusions of law in support of its judgment. They reflect that the district court based its judgment on findings or conclusions that: (i) appellees "are people with hearing disabilities," specifically deafness, which brought them within the definition of "persons with disabilities" who are protected by chapter 121, *see id*. § 121.002(4); (ii) "TDCJ prisons are 'public facilities' as defined by Chapter 121," and thus subject to that statute's prohibitions against disability discrimination, *see id.* §§ 121.002(5), .003(d)(2), (3); and (iii) Livingston had, as the court had previously declared, "unlawfully discriminated" against appellees within the meaning of section 121.003 of the human resources code by "failing to make reasonable accommodations for prisoners with hearing disabilities in TDCJ's policies, practices, and procedures" and by "failing to provide auxiliary aids and services necessary to allow the full use and enjoyment of TDCJ facilities." *Id*. § 121.003(d)(2), (3). Livingston had committed these violations, the district court found, by "fail[ing] to provide videophones to [appellees];" and "den[ying] [appellees] access to prison programs, activities, and services by relying

---

[9] However, in the case of orientation programs, the district court made an exception to its requirement that Livingston provide appellees live sign-language interpretation either in person or by remote video connection: it permitted the alternative of pre-recorded video interpretation.

on inmates and volunteers to provide inadequate interpreting services or refusing to provide appropriate auxiliary aids or other accommodations for [appellees'] hearing disabilities."

Livingston perfected this appeal from the district court's final judgment. On agreed motion, we dismissed Livingston's earlier appeal from the temporary injunction as moot.[10]

## ANALYSIS

Livingston brings four issues on appeal. His central contention, raised through his first three issues, is that sovereign immunity bars appellees' claims against him. Assuming we sustain at least one of these issues, Livingston urges in his fourth issue that we vacate the judgment award of attorney's fees and costs under the UDJA.

**Standard of review**

A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). Analysis of whether this authority exists ordinarily begins with the plaintiff's live pleadings,[11] but we must also consider evidence the parties presented below that is

---

[10]  *See Livingston v. Arrington*, No. 03-11-00266-CV, 2012 WL 1499490, at *1 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.).

[11]  When reviewing the pleadings, we consider whether the plaintiff has met an initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). We take the pleaded facts as true in the first instance and liberally construe them with an eye to the pleader's intent. *See id*. However, mere unsupported legal conclusions do not suffice. *See Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515–16 & nn.7–8 (Tex. App.—Austin 2010, no pet.).

relevant to the jurisdictional issue. *See id.* at 226–27; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In this case, the jurisdictional issue comes to us following trial on the merits, so the evidence potentially relevant to jurisdiction includes that presented at trial. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Moreover, as indicated below, the facts upon which jurisdiction depends in this case overlap to some extent with the elements of the claims tried at trial, so the district court's explicit fact findings on the merits, and any challenges thereto, are also relevant to our jurisdictional inquiry.[12] The ultimate question of whether particular facts affirmatively demonstrate a claim within the trial court's jurisdiction is one of law that we review de novo. *See Miranda*, 133 S.W.3d at 226; *Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 513, 516 & n.8 (Tex. App.—Austin 2010, no pet.).

**Sovereign immunity and the ultra vires exception**

Absent Legislative waiver, sovereign immunity deprives Texas state courts of subject-matter jurisdiction over any suit against the State or its agencies or subdivisions. *See, e.g.*, *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620–21 (Tex. 2011) (per curiam). That same

---

[12] In this respect, the procedural posture of this appeal is similar to cases in which a trial court has deferred until trial an evidence-based challenge to a jurisdictional fact that overlaps the merits. *See Miranda*, 133 S.W.3d at 226 (recognizing that where jurisdictional issues overlap the merits, trial courts have some discretion to defer evidence-based challenges to jurisdictional facts until trial); *see also Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 394 (Tex. 2011) (quoting *State v. Lain*, 349 S.W.2d 579, 582 (Tex. 1961) (describing one example of a type of case in which such deferral may be appropriate, trespass-to-try-title suits brought against state officials)); *cf. Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 719 (Tex. App.—Austin 2009, no pet.) (contrasting appellate review of *pretrial* challenges to the existence of jurisdictional facts where those facts implicate the merits versus review when they do not).

immunity generally extends to Texas state officials who, like Livingston, are sued in their official capacities because that "is merely 'another way of pleading an action against the entity of which [the official] is an agent.'" *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (quoting *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))). The Texas Supreme Court's contemporary rationale for its continued adherence to this ancient common-law doctrine is that the Legislature, not the Judiciary, is best suited to make the policy-laden judgments as to if and how governmental resources should be expended. *See, e.g.*, *Sefzik*, 355 S.W.3d at 621 (citing *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002)); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331–32 (Tex. 2006). This principle of deference embodied in sovereign immunity extends not only to the Legislature's choices regarding specific state expenditures, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority. *See, e.g.*, *Sefzik*, 355 S.W.3d at 621 (citing *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 839 (Tex. 1958)); *Heinrich*, 284 S.W.3d at 372; *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.,* 600 S.W.2d 264, 265 (Tex. 1980).[13]

Appellees have not asserted that chapter 121 of the human resources code, or any other statute, waives sovereign immunity with respect to their injunctive and declaratory claims

---

[13] *See also* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.").

against Livingston.  Instead, they seek to rely on the "ultra vires" exception to sovereign immunity.[14]

Under the ultra vires exception to sovereign immunity, a plaintiff may sue a state officer in his official capacity (thereby binding the State through its agent) for prospective injunctive or declaratory relief to compel compliance with statutory or constitutional provisions.  *See Heinrich*, 284 S.W.3d at 372–80.  Sovereign immunity is held not to bar such claims because, in concept, acts of state officials that are not lawfully authorized are not considered to be acts of the State, and the remedy of compelling such officials to comply with the law, while binding on the State, "do[es] not attempt to exert control over the state [but] attempt[s] to reassert the control of the state."  *Id*. at 372.  "Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy."  *Id*.

---

[14] Citing language in the 1997 *Federal Sign* case, appellees seem to argue that the "ultra vires requirements" apply only to their declaratory claims and that their injunctive claims are governed by distinct or more lenient concepts that permit suits against state officials to "determine or protect" a private party's rights against alleged violations of state law.  *See Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997).  To the contrary, as more recent Texas Supreme Court decisions have made clear, the cited language from *Federal Sign* merely refers to the ultra vires exception, not some other concept, *see City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009), although the high court has since construed the exception more narrowly than portions of *Federal Sign* might have suggested it is.  It is thus only by meeting the requirements of the ultra vires exception, as summarized above, that appellees' official-capacity claims against Livingston can avoid sovereign immunity's bar, whether they seek declaratory or injunctive relief.  *See Heinrich*, 284 S.W.3d at 380 ("With the limited ultra vires exception . . . governmental [or sovereign] immunity protects government officers sued in their official capacities to the extent that it protects their employers.").

But regardless how appellees might have labeled their injunctive claims, it remains that they seek the type of relief that distinguishes claims that can only be brought under the ultra vires exception.  *See Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 n.2 (Tex. 2011) (per curiam) (similarly ignoring plaintiff's "refus[al] to apply the ultra vires label" and holding that underlying nature of claims —which sought "to compel a government official . . . to perform some act that [the plaintiff] considers to be nondiscretionary"—placed the claims "within the ultra vires rationale").  We will thus construe appellees' arguments as seeking to invoke the ultra vires exception with respect to both their declaratory and injunctive claims.

To come within the ultra vires exception, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* Otherwise, the suit implicates sovereign immunity because it seeks to "control state action," to dictate the manner in which officers exercise their delegated authority. *See id.*; *Creedmoor–Maha*, 307 S.W.3d at 515–16. Moreover, even if the plaintiff alleges or proves conduct that is, in fact, ultra vires, the injunctive or declaratory remedy cannot have the effect of granting relief that sovereign immunity independently bars. *See Heinrich*, 284 S.W.3d at 369–76 (money damages or other retrospective monetary relief); *IT-Davy*, 74 S.W.3d at 855–56 (enforcing contract rights against the State); *Creedmoor–Maha*, 307 S.W.3d at 515 (review of administrative order in absence of statutory right of judicial review). On the other hand, sovereign immunity does not bar a remedy for ultra vires conduct merely because it has the effect of requiring some sort of expenditure prospectively—if the officer's delegated legal authority leaves him no discretion but to make the expenditure, the court can compel him to comply with the law going forward. *See Heinrich*, 284 S.W.3d at 371–76.

The distinction between a valid ultra vires claim and one seeking to control state action turns on (1) the particular acts or omissions that the official is committing, as determined under the standard of review we have previously described; and (2) construction of the relevant statutory or constitutional provisions to determine whether those acts are within, or beyond, the official's discretionary authority. *See Director of Dep't of Agric.*, 600 S.W.2d at 265–70; *Cobb v. Harrington*, 190 S.W.2d 709, 710–12 (Tex. 1945); *Creedmoor–Maha*, 307 S.W.3d at 515–16. Statutory construction presents a question of law that we review de novo. *See Texas W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012). When construing a statute, our primary objective

11

is to ascertain and give effect to the Legislature's intent. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern that intent, we begin with the statute's words. *Id*. "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g). The words cannot be examined in isolation, but must be informed by the context in which they are used. *TGS-NOPEC Geophysical*, 340 S.W.3d at 441. We rely on the plain meaning of the words, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to "absurd results." *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see also* Tex. Gov't Code § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We further presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen. *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008). We likewise attempt to give effect to all of a statute's words and avoid treating any language as surplusage if reasonable and possible. *See Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010); *see also* Tex. Gov't Code § 311.021(2) (presumption that entire statute is intended to be effective); *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) ("[c]ourts 'do not lightly presume that the Legislature may have done a useless act'" (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex. 1998))). Our analysis of the statutory text may also be informed by such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, and "common law or former statutory provisions, including laws on the same or similar

12

subjects," and the title of the provision. Tex. Gov't Code § 311.023(1)–(4), (7). Similarly, we assume that when enacting a statute, the Legislature was aware of the background law and acted with reference to it. *See In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

Under the foregoing principles, as Livingston emphasizes, sovereign immunity would bar appellees' claims unless chapter 121, as a matter of statutory construction, left him no discretion but to provide appellees the videophones or sign-language interpreters they demanded. Livingston disputes that chapter 121 limits his discretion in this manner, and urges that appellees and the district court have instead commandeered fiscal, administrative, and policy decisions that are within his delegated authority or are the Legislature's prerogative. In his first issue, Livingston argues that the district court erred in holding that TDCJ prison facilities are "public facilities" and thus subject to chapter 121's requirements.[15] Additionally, within that same issue, Livingston disputes that either of the chapter 121 anti-discrimination provisions that he was held to have violated actually limit his discretion in regard to video phones or sign-language interpreters. To the contrary, Livingston insists, the requirements that he "make reasonable accommodations in policies, practices, and

---

[15] Appellees accuse Livingston of raising this argument for the first time on appeal. Even if appellees are correct, Livingston would be free to do so—and so could we. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95–96 (Tex. 2012) (holding that sovereign immunity deprives courts of subject-matter jurisdiction and is thus an issue that may be raised for the first time on appeal); *Texas Ass'n of Bus.*, 852 S.W.2d at 446 (holding that subject-matter jurisdiction may be raised for the first time on appeal by the parties or by the court). In fact, while they decry this supposed innovation by the Office of Solicitor General on appeal, appellees do not go as far as to assert that Livingston's trial counsel waived the contention by failing to raise it below.

procedures" and "provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility" affirmatively grant him discretion to determine the accommodations that are "reasonable" or "necessary" under the circumstances. Alternatively, in his second and third issues, Livingston argues that his decisions not to provide appellees video phones or additional sign-language interpreters did not constitute failures to make "reasonable accommodations" or to provide "necessary" auxiliary aids and services under a proper construction of these requirements.

We need only address Livingston's first argument—his assertion that TDCJ prison facilities are not "public facilities" under chapter 121's definition of that term—because that question is dispositive of whether appellants have asserted claims within the ultra vires exception to sovereign immunity.

**Prisons and "public facilities"**

When concluding that "TDCJ prisons are 'public facilities' as defined by Chapter 121 of Texas Human Resources Code," the district court cited as support, "Tex. Hum. Res. Code § 121.002(5)," which is chapter 121's definition of "public facilities."[16] That definition states:

"[p]ublic facilities" includes

- a street, highway, sidewalk, walkway, common carrier, airplane, motor vehicle, railroad train, motor bus, streetcar, boat, or any other public conveyance or mode of transportation;

---

[16] Although this legal conclusion was styled as a fact finding, it rests substantively on construction of the above definition, a question of law, as will become apparent in the discussion that follows. *See, e.g.*, *Cities of Allen v. Railroad Comm'n of Tex.*, 309 S.W.3d 563, 570 (Tex. App.—Austin 2010) (trial court's characterizations of factual findings versus legal conclusions "is not controlling on appeal"), *aff'd sub nom. Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156 (Tex. 2011).

14

- a hotel, motel, or other place of lodging;

- a public building maintained by any unit or subdivision of government;

- a building to which the general public is invited;

- a college dormitory or other educational facility;

- a restaurant or other place where food is offered for sale to the public;

- and any other place of public accommodation, amusement, convenience, or resort to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited.

Tex. Hum. Res. Code § 121.002(5) (bullet points and formatting added for clarity).

Livingston asserts that the sole component of this definition having conceivable application to TDCJ prisons would be the third one in the list—"*a public building maintained by any unit or subdivision of government*." And while he does not appear to question that a TDCJ prison unit would be "a . . . building," and likewise one that is "maintained by [a] unit or subdivision of government," namely TDCJ, Livingston disputes that it would be "a *public* building maintained by [a] unit or subdivision of government." Livingston reasons that the Legislature intended "public" or "public building" to denote a building that is open and accessible to "the public." The TDCJ prisons at issue do not meet that requirement as a matter of law, Livingston insists, because the evidence is undisputed that the facilities are not open or accessible to the public—to the contrary, their fundamental nature and purpose is to separate offenders *from* the public, as reflected in everything from visitation areas to the cells and walls.[17]

---

[17] *See also Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("The very object of imprisonment is confinement."); *Retzlaff v. Texas Dep't of Criminal Justice*, 135 S.W.3d 731, 742

15

In their briefing, appellees have appeared to agree with Livingston's assessment that "public building maintained by any unit or subdivision of government" is the sole component of the "public facilities" definition that could be relevant here. However, during oral argument, appellees posited that a TDCJ prison might also amount to an "other place of public accommodation . . . to which . . . any classification of persons from the general public is regularly, normally, or customarily invited" under the final component of the "public facilities" definition. But appellees have not offered further argument or authorities in support of that view, and Livingston points out authority suggesting the contrary: federal courts have construed the term "public accommodations"—the focus of Title III of the ADA—to refer to places that are open or accessible to the public, and that prisons are not included in that category.[18] We are similarly unpersuaded by appellees' suggestion that TDCJ prisons might be "places of public accommodation" under chapter 121's definition of "public facilities," let alone that inmates can be said to be "regularly, normally, or customarily invited" there.

Appellees have otherwise relied entirely on the assertion that a TDCJ prison unit comes within "a public building maintained by any unit or subdivision of government," thereby

---

(Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The fundamental purpose of a prison is to isolate its inhabitants from society and insure that they remain isolated until they are eligible for release.").

[18] *See* 42 U.S.C.A. § 12182(a) (West 2013) (listing public accommodations to which Title III applies); *see also Johnson v. Federal Bureau of Prisons*, No. 08-6017-HA, 2011 WL 198184, at *3 (D. Or. Jan. 18, 2011) (holding Title III of ADA inapplicable to Federal Bureau of Prisons); *White v. Secor, Inc.*, No. 7:10-cv-00428, 2010 WL 4630320, at *2 (W.D. Va. Nov. 5, 2010) (mem. op.) (holding plaintiff failed to establish private correctional facility was a place of public accommodation under Title III of the ADA); *Edison v. Douberley*, No. 2:05-CV-307-FtM-29SPC, 2008 WL 4194813, at *4 (M.D. Fla. Sept. 9, 2008) (holding Title III of ADA inapplicable to prisons); *Morgan v. Mississippi*, No. 2:07cv-15-MTP, 2008 WL 449861, at *5 (S.D. Miss. Feb. 14, 2008) (same).

joining issue with Livingston regarding the proper construction of "public" or "public building" as used within that provision. Contrary to Livingston's view that "public" refers to accessibility or openness, appellees insist that the Legislature meant "public" instead to denote the nature of ownership over the "building maintained by any unit or subdivision of government"—belonging to the people of Texas or the "larger community," as opposed to private interests. Because TDCJ prisons are owned by the people of Texas through their state government, appellees reason, such a facility is "a *public* building maintained by any unit or subdivision of government," and thus is a "public facility" subject to chapter 121.

Although the Legislature defined "public facilities" in section 121.002(5), and that definition repeatedly utilizes "public" in both its noun and adverbial forms to describe them, *see id.*, the Legislature did not provide an explicit definition of "public" itself. In the absence of an explicit definition, the parties seek support in the "ordinary meaning" of that word, as reflected in dictionary definitions. These resources do little more than demonstrate that the terms "public" or "public building," if read in isolation, are susceptible to either of the competing constructions the parties advocate.[19] To determine which meaning the Legislature intended, we must delve more broadly into the text of the "public facilities" definition, and that of chapter 121 as a whole. *See Texans Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 922–28 (Tex. App.—Austin 2010, pet. denied) (applying similar analysis to determine legislative intent as between multiple alternative meanings to which "political" under Tex. Gov't Code § 556.004 was susceptible); *see also TGS-NOPEC*

---

[19] *Cf*. Black's Law Dictionary 1348 (9th ed. 2009) (defining "public" to mean "[o]pen or available for all to use, share, or enjoy"), 1349 (defining "public building" as "[a] building that is accessible to the public; esp., one owned by the government") *with id*. at 1348 (also defining "public" as "[r]elating or belonging to an entire community, state, or nation").

17

*Geophysical*, 340 S.W.3d at 441 (statutory language cannot be examined in isolation, but must be informed by the context in which it is used).

Livingston urges that the Legislature's intent that "public building" denote accessibility and openness rather than public ownership becomes apparent when considering several features of the statute that define the context in which the term appears. The first, in Livingston's view, is found by considering the effect of adopting appellees' construction of "public" within "public building maintained by any unit or subdivision of government." Livingston suggests that if "public" refers to public ownership (i.e., by government), this component of the definition would mean "[government-owned] building maintained by any unit or subdivision of government." In Livingston's view, this is a redundancy, rendering either "public" or "maintained by any unit or subdivision of government" mere surplusage, and it is established that we should avoid such constructions if possible. *See Marks*, 319 S.W.3d at 663; *see also* Tex. Gov't Code § 311.021(2) (presumption that entire statute is intended to be effective).

Livingston next asserts that only his proposed construction of "public" is consistent with the Legislature's use of "public" elsewhere in the definition of "public facilities." He urges that each of the references to "public" in other components of the definition—"other *public* conveyance or mode of transportation," "a building to which the general *public* is invited," "a restaurant or other place where food is offered for sale to the *public*," and "any other place of *public* accommodation . . . to which the general *public* or any classification of persons from the general *public* is . . . invited," *see* Tex. Hum. Res. Code § 121.002(5)—refer to accessibility or openness to the public, not to public or governmental ownership. *See Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) (statutory terms should be interpreted consistently in every part of

18

an act). To similar effect, Livingston invokes the rule of ejusdem generis, which holds that "when words of a general nature are used in connection with the designation of particular objects or things, [courts] generally presume that the legislature intended to limit the general words to the same class or kinds as the specific examples." *Texans Uniting for Reform & Freedom*, 319 S.W.3d at 925; *see, e.g.*, *Hilco Elec. Co-op, Inc. v. Midlothian Butane Gas Co., Inc.*, 111 S.W.3d 75, 81 (Tex. 2003) (holding that "any lawful purpose" was limited to purposes similar in kind or class to specifically identified categories listed within statutory section). He observes that each of the other components of the "public facilities" definition refers to a place whose distinguishing characteristic is that it is open to or serves the public or some subset of it—"a . . . common carrier . . . or any other public conveyance or mode of transportation;" "a hotel, motel, or other place of lodging;" "a building to which the general public is invited;" "a college dormitory or other educational facility;" "a restaurant or other place where food is offered for sale to the public;" or "any other place of public accommodation, amusement, convenience, or resort to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." Considering this context, Livingston reasons, the Legislature was plainly using "public" to denote openness and accessibility to outsiders, not governmental ownership, and that we must presume that it intended the same in "a *public* building maintained by any unit or subdivision of government."

More broadly, Livingston questions whether construing "public buildings" and thus "public facilities" to include prisons, as appellees advocate, would be compatible with the Legislature's overarching policy objectives reflected in chapter 121. *See Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) (when construing statutes, courts "consider the statute's language, history, and purposes and the consequences of alternate constructions"). He observes that

the Legislature's explicit purpose in enacting chapter 121 was to foster economic and social empowerment, independence, and opportunity for the disabled—specifically:

> to encourage and enable persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, to become gainfully employed, and to otherwise fully enjoy and use all public facilities available within the state.

Tex. Hum. Res. Code § 121.001. Livingston disputes whether or how this vision of empowerment and opportunity would translate to prisons, where, as he notes, prisoners have essentially no personal independence, cannot become gainfully employed, and are, by definition, prevented from using "all public facilities available within the state." He also points out some practical implications of applying section 121.003 anti-discrimination prohibitions to TDCJ facilities. For example, he observes that the statute would seem to require that TDCJ allow inmates to bring their assistance animals and their trainers into the prison facilities. *See id*. § 121.003(c) ("No person with a disability may be denied the use of a[n] . . . assistance animal . . . ."), (i) ("An assistance animal in training shall not be denied admittance to any public facility when accompanied by an approved trainer . . . ."). This, Livingston suggests, would be an "absurd result" the Legislature could not possibly have intended. *See Texans Uniting for Reform & Freedom*, 319 S.W.3d at 924 (rejecting construction of "political" that would yield absurd results).

In response, appellees defend their view that "*public* building maintained by any unit or subdivision of government" denotes governmental ownership by asserting that Livingston's contrary construction would render superfluous another component of the "public facilities" definition, "a building to which the general public is invited." They additionally dispute that

construing "public facilities" to include TDCJ prisons is inconsistent or incompatible with the overarching policy goals of chapter 121. Appellees urge that the accommodations they seek are necessary for them to have equal access to the educational, social, and economic opportunities, albeit limited, that are available to them while incarcerated, as well as the opportunities for self-improvement TDCJ provides to "promote positive change in offender behavior [and] reintegrate offenders into society . . . ." Tex. Gov't Code § 493.001.

Livingston counters that a "public building maintained by any unit or subdivision of government" would only be redundant of a "building to which the general public is invited" if one treats as surplusage the phrase ". . . maintained by any unit or subdivision of government" in the former. Under his proposed construction, Livingston insists, the two components of the definition are easily reconciled by recognizing that "a public [in the sense of openness or accessibility to the public] building maintained by any unit or subdivision of government" would be limited to government-maintained buildings, while "building to which the general public is invited" would extend to private ones. And if there is a redundancy or surplusage created by either of the two competing constructions of "public," Livingston adds, it is the "[government-owned] building maintained by any unit or subdivision of government" tautology yielded by appellees' view.

As with the parties' reliance on dictionary definitions, their arguments attributing asserted redundancies or surplusage to the rival construction of "public" ultimately do not resolve the issue. But appellees offer no good response to Livingston's observations that the Legislature used "public" consistently throughout its "public facilities" definition to refer to openness or accessibility to the public, not to public or governmental ownership, and that it made such openness and accessibility the defining characteristic of each category of "public facilities." We agree with

21

Livingston that, absent contrary indications in the statutory text—and there are none—we must presume the Legislature intended to use "*public*" in the same sense throughout its definition of "public facilities" to refer to accessability and openness to the public, not to government ownership. *See Needham*, 82 S.W.3d at 318 (statutory terms should be interpreted consistently in every part of an act); *see also Hilco Elec. Co-op., Inc.*, 111 S.W.3d at 81 (applying ejusdem generis); *Texans Uniting for Reform & Freedom*, 319 S.W.3d at 925 (same).

Even if we conclude that the Legislature intended "public buildings" to mean buildings that are open and accessible to the public in some sense, appellees alternatively maintain that TDCJ prisons would still qualify as "public facilities" because inmates remain members of "the public" despite their incarceration, just not members of the *general* public. In support, appellees cite provisions of chapter 121[20] and a dictionary definition[21] acknowledging that "public" in some contexts can include subsets of the "general public" and need not mean the entirety of it. Appellees likewise argue that "accessible to the public" does not always mean open and available for all members of the general public. They liken prisons to public elementary schools in that both,

---

[20] *See* Tex. Hum. Res. Code § 121.003(e) ("Regulations relating to the use of public facilities by any designated class of persons from the general public may not prohibit the use of particular public facilities by persons with disabilities who, except for their disabilities . . . , would fall within the designated class."). We would add "any other place of public accommodation, amusement, convenience, or resort to which the general public or *any classification of persons from the general public* is regularly, normally, or customarily invited," within the "public facilities" definition. *See id*. § 121.002(5) (emphasis added).

[21] *See* Black's Law Dictionary 1227 (6th ed. 1990) ("public" "does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few. Accordingly, it has been defined or employed as meaning the inhabitants of a particular place . . . ."). Incidentally, this definition of "public" is not found in the most current edition of Black's Law Dictionary upon which appellees previously relied.

22

according to appellees, "enforce separation through physical barriers, strictly limit the freedom of their inhabitants, regulate visitors, and limit visitors to certain areas."

We note that while the Legislature explicitly included "a college dormitory or other educational facility" within its definition of "public facilities," *see* Tex. Hum. Res. Code § 121.002(5), there is no similar express indication in chapter 121 that it considered prisons to be "public facilities." Nor, Livingston adds, is there any indication that the Legislature considered prison inmates to be part of "the public" in any material sense. To the contrary, Livingston observes, the Legislature has sharply distinguished between prison inmates and the "public." *See, e.g.*, Tex. Gov't Code § 492.007 (requiring Texas Board of Criminal Justice to "provide the public with a reasonable opportunity to appear before the board and to speak on any issue under the jurisdiction of the board"); *id*. § 498.004(c)(4) (requiring TDCJ to "consider whether any impact to public safety is likely to result from inmate's release on parole or to mandatory supervision" if it reinstates an inmate's good-conduct time that was previously suspended); *id.* § 508.141(d) (authorizing parole panel to release inmates on parole "if the panel determines that the inmate's release will not increase the likelihood of harm to the public"). We are persuaded that the Legislature did not consider TDCJ prisons to be open or accessible to the public in any sense that would make them "public facilities" under chapter 121.

Finally, appellees, joined by amicus Disability Rights Texas, draw our attention to the ADA and emphasize that federal courts have held that Title II of that act, which concerns "public entities," applies to prisons. *See* 42 U.S.C.A. § 12131 (West 2013) (defining "public entity" as, among other things, "any department, agency, special purpose district, or other instrumentality of a State or States or local government"); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206,

23

210 (1998) (holding state prisons fall within the statutory definition of "public entity" under Title II of the ADA). Title II, they urge, should inform our construction of "public," "public buildings," and "public facilities" under chapter 121. *See In re Allen*, 366 S.W.3d at 706 (we presume the Legislature is aware of the background law and acts with reference to it). They additionally emphasize anecdotal legislative history from amendments to chapter 121 which, they assert, demonstrates "legislative intent" that chapter 121 should be construed and applied the same way the ADA is.

As an initial observation, the Legislature enacted the statute that would eventually be codified as chapter 121—including its definition of "public facilities"—approximately twenty years before the federal government enacted the ADA, and the "public facilities" definition has remained essentially unchanged since that time.[22] Our search for the Texas Legislature's intent enacting this language is not somehow informed by language the U.S. Congress used in the ADA two decades later. But more importantly, it is the text of chapter 121, not that of the ADA, that ultimately controls our analysis of what chapter 121 means. *Cf. Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507–09 (Tex. 2012) (we "look to federal law for guidance only when the relevant provisions [of the federal law] are analogous"). Based on the text of chapter 121, we have concluded that there is no counterpart to ADA Title II in chapter 121 that purports to define or extend the scope of "public facilities" covered by the statute on the basis of public or governmental ownership, as opposed to public accessibility. That same analysis further suggests that if there is an aspect of the

---

[22] *See* Act of May 20, 1969, 61st Leg., R.S., ch. 416, § 2, 1969 Tex. Gen. Laws 1374, 1375.

24

ADA that is instructive here, it is instead Title III, which, as noted, applies to "places of public accommodation"—and has been held not to include prisons.[23]

We hold that, as a matter of law, TDCJ prison facilities are not "public facilities" within the meaning of chapter 121 of the human resources code. It follows that appellees have failed to prove any conduct by Livingston that is ultra vires of his delegated authority and discretion. Consequently, sovereign immunity deprived the district court of subject-matter jurisdiction. *See Heinrich*, 284 S.W.3d at 372. This includes not only jurisdiction to grant appellees the injunctive and declaratory relief they sought and ultimately obtained, but also to award attorney's fees and costs under the UDJA, as "the UDJA does not enlarge the trial court's jurisdiction, but is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" *Sefzik*, 355 S.W.3d at 621–22 (quoting *Texas Ass'n of Bus.*, 852 S.W.2d at 444); *see Texas Dep't of Pub. Safety v. Alexander*, 300 S.W.3d 62, 80 (Tex. App.—Austin 2009, pet. denied). Accordingly, we sustain Livingston's first and fourth issues, reverse the district court's judgment, and render judgment dismissing appellees' claims for want of subject-matter jurisdiction. *See Koseoglu*, 233 S.W.3d at 840; *Creedmoor–Maha*, 307 S.W.3d at 526; *see also Good Shepherd Med. Ctr. v. State*, 306 S.W.3d 825, 837 (Tex. App.—Austin 2010, no pet.) (no opportunity to replead to cure jurisdictional defect once claims have been tried). We need not reach Livingston's other two contentions, and express no opinion regarding them. *See* Tex. R. App. P. 47.1.

---

[23] *See supra* note 18.

**CONCLUSION**

We reverse the district court's judgment and render judgment dismissing appellees' claims for want of subject-matter jurisdiction.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Rendered

Filed:   July 17, 2013