# IN THE SUPREME COURT OF TEXAS

══════════════

No. 13-0867

══════════════

LAURA BEEMAN AND JANET LOCK, PETITIONERS,

v.

BRAD LIVINGSTON, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR
OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, RESPONDENT

══════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

══════════════════════════════════════════════════════════

**Argued March 25, 2015**

JUSTICE JOHNSON delivered the opinion of the Court.

Deaf inmates housed in a unit of the Texas Department of Criminal Justice (TDCJ) sued TDCJ's Executive Director, claiming he acted ultra vires because he violated the Texas Human Resources Code by failing to reasonably accommodate their impairment. The trial court agreed with the plaintiffs and ordered TDCJ to make certain accommodations. The court of appeals determined that the Human Resources Code was not applicable to prisons because they are not "public facilities" to which the code applies and the Director had sovereign immunity, so even if the Executive Director did not comply with the Code, his actions did not fit within the ultra vires exception to sovereign immunity. Because the inmates did not plead or claim the Legislature waived the Director's sovereign immunity and there was no ultra vires exception on which to maintain suit against him otherwise, the appeals court dismissed the case for want of jurisdiction. We affirm.

## I. Background

The Texas Human Resources Code (the Code) provides that "[p]ersons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state." TEX. HUM. RES. CODE § 121.003(a).[1] The Code's definition of "public facility" includes "a public building maintained by any unit or subdivision of government." *Id.* § 121.002(5). Prohibited discrimination includes failing to "make reasonable accommodations in policies, practices, and procedures," or "provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility." *Id.* § 121.003(d)(2)-(3).

Laura Beeman and Janet Lock (collectively, Beeman) are deaf inmates housed at the TDCJ Lane Murray Unit. Beeman sued Brad Livingston, the executive director of TDCJ, claiming that he violated Chapter 121 by denying her the opportunity to participate in and benefit from programs and services provided to non-disabled TDCJ inmates.[2] She alleged that Livingston failed to provide her with reasonable access to the telephone system used by inmates to make telephone calls to family and friends, and failed to provide sign language interpreters to allow her to meaningfully participate in educational, religious, and other programs at the prison. She did not allege that the Legislature had waived sovereign immunity as to Livingston, but rather, relied on the ultra vires exception to sovereign immunity as a basis for showing the trial court had jurisdiction. Livingston countered with

---

[1] The Legislature amended this provision during the last legislative session. *See* Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 4.416. The amendment has no impact on our analysis.

[2] Leslie Arrington and Kathy Williams were also initially plaintiffs in the suit. They were released from TDCJ while the suit was pending so the court of appeals dismissed the appeal as to them because their claims were moot. *Livingston v. Arrington*, No. 03-12-00205-CV, 2012 WL 6764069 (Tex. App.—Austin Dec. 28, 2012, order) (per curiam).

a plea to the jurisdiction, arguing that the Code does not clearly and unambiguously waive immunity. The trial court denied Livingston's plea.

Beeman moved for a temporary restraining order and a temporary injunction. The trial court denied the motion for temporary restraining order, but granted a temporary injunction directing Livingston to provide services by means of teletypewriter or text telephone (TTY) to permit Beeman to make telephone calls.[3] After a bench trial, the trial court determined that Chapter 121 of the Code applied to prisons and found that Livingston discriminated against Beeman in violation of its provisions by failing to make reasonable accommodations for her disability.[4] The trial court rendered judgment for Beeman and ordered Livingston to provide qualified sign language interpreters (1) at all disciplinary hearings, (2) during prison orientations, (3) during grievance proceedings, (4) for all educational classes, religious services, and rehabilitation programs, (5) to assist during job training, and (6) upon request to facilitate communication with prison staff. It also ordered him to provide deaf inmates with access to (1) a videophone and relay service on the same basis that hearing prisoners have access to telephones, and (2) TTY and the relay service so that prisoners may place calls to people outside the prison.

---

[3] A relay service enables a person with a hearing disability to communicate via telephone with a person without a hearing disability. A deaf individual can use a TTY (which has a screen and a keyboard) to contact a live relay operator who then places an outbound voice call to a recipient. The relay operator verbally relays typed TTY messages to the called party and then types the verbal messages to the deaf individual. *See Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1039 n.1 (10th Cir. 2011).

[4] Livingston filed an interlocutory appeal as to the temporary injunction, but while his appeal was pending the trial court held a trial on Beeman's motion for a permanent injunction. The court of appeals dismissed the interlocutory appeal as moot. *Livingston v. Arrington*, No. 03-11-00266-CV, 2012 WL 1499490 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.).

The court of appeals reversed and dismissed Beeman's claims for want of subject matter jurisdiction. *Livingston v. Beeman*, 408 S.W.3d 566 (Tex. App.—Austin 2013). It held that TDCJ prison facilities are not "public facilities" under Chapter 121 of the Code because they are not open and accessible to the public, and therefore Livingston could not have acted ultra vires by failing to comply with its provisions. *Id.* at 580-81.

In this Court Beeman asserts that the court of appeals misconstrued the phrase "public building" in Chapter 121 by concluding that it means a building that is open and accessible to the public. She also argues that even accepting the court of appeals' construction of "public building," a prison still qualifies as a public building because prisoners are a subset of the public, and other members of the public, such as volunteers, routinely access TDCJ prisons. That being so, she maintains, the court of appeals erred by dismissing her suit because her claims against Livingston fall within the ultra vires exception to sovereign immunity because he failed to comply with Chapter 121's mandated requirements.

Livingston responds that given the context of Chapter 121's definition of "public facility," the court of appeals correctly held that prisons are not public facilities because "public" means open to the public. Therefore, he reasons, Beeman's suit is barred by sovereign immunity and the ultra vires exception to sovereign immunity does not apply because he could not have acted ultra vires when Chapter 121's requirements do not apply in the first place. He also asserts that inmates are not part of the "public" because the core function of prisons is to *separate* inmates from the general public. Finally, Livingston argues that even if Chapter 121 applies to prisons, Livingston is immune

from suit because he has discretion as to how to accommodate deaf inmates and he is not acting ultra vires by failing to provide services that are not specifically mandated by law.

## II. Sovereign Immunity and Ultra Vires Claims

A plaintiff who sues the State must demonstrate that the State has consented to the suit; otherwise the suit is barred by sovereign immunity. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Generally, the State cannot be sued absent a waiver of its immunity by the Legislature. *City of Hous. v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). But an ultra vires claim is directed toward determining or protecting a party's rights against a state official acting without legal or statutory authority, and is not barred by sovereign immunity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 368 (Tex. 2009). To fall within this ultra vires exception, a plaintiff must allege and prove that the state official acted without legal authority or failed to perform a ministerial act. *Id.* at 372. Beeman asserts that TDCJ is bound by Chapter 121 to make reasonable accommodations for her, and Livingston's failure to do so constitutes an unlawful, ultra vires act.

We would ordinarily first consider whether a government official such as Livingston has immunity from suit because immunity implicates a trial court's jurisdiction. *Sw. Bell Tel., L.P. v. Emmett*, ___ S.W.3d ___, ___ (Tex. 2015). Here, however, we turn first to whether Chapter 121 is applicable to TDCJ prisons, and if so, how. That is because whether Livingston's actions were ultra vires depends on whether the statute required anything of him. *See id.* at ___.

## III. Texas Human Resources Code § 121.002

Our primary goal when construing a statute is to give effect to the Legislature's intent. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). We do so by

5

relying on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result. *Id.* Further, we presume that the Legislature selected each word in the statute with a purpose in mind. *Id.*

The Code provides that "[t]he policy of the state is to encourage and enable persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, to become gainfully employed, and to otherwise fully enjoy and use all public facilities available within the state." TEX. HUM. RES. CODE § 121.001. A person with a disability has "the same right as persons without disabilities to the full use and enjoyment of any public facility" and a failure to "make reasonable accommodations in policies, practices, and procedures" is prohibited. *Id.* § 121.003(a), (d)(2).

The disagreement is over whether TDCJ prisons are public facilities to which Chapter 121 applies. "Public facilities" are defined in Chapter 121 as:

- a street, highway, sidewalk, walkway, common carrier, airplane, motor vehicle, railroad train, motor bus, streetcar, boat, or any other public conveyance or mode of transportation;
- a hotel, motel, or other place of lodging;
- a public building maintained by any unit or subdivision of government;
- a building to which the general public is invited;
- a college dormitory or other educational facility;
- a restaurant or other place where food is offered for sale to the public; and
- any other place of public accommodation, amusement, convenience, or resort to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited.

6

*Id.* § 121.002(5) (bullet points and formatting added).[5] The court of appeals concluded that a TDCJ prison is not a "public building maintained by any unit or subdivision of government" because the Legislature intended "public" to refer to accessibility and openness to the public, not government ownership, and a TDCJ prison is not the type of facility the Legislature intended to come within the statute.[6] 408 S.W.3d at 579-80. While Chapter 121 is not a model of clarity, we ultimately agree with the court of appeals that construing the term "public facility" to include prisons does not reflect legislative intent as expressed in the term's definition and the statute as a whole.

Beeman first asserts that the court of appeals ignored the plain and common meaning of "public building." She argues that the definitions of "public" and "public building" in Black's Law Dictionary in 1968 and 1990 referred to the manner in which a government agency *uses* a building. BLACK'S LAW DICTIONARY 1228 (6th Centennial ed. 1990) (defining public building as "[o]ne of which the possession and use, as well as the property in it, are in the public," "[a]ny building held, used, or controlled exclusively for public purposes by any department or branch of government," and "[a] building belonging to or used by the public for the transaction of public or quasi public business"); BLACK'S LAW DICTIONARY 1393 (rev. 4th ed. 1968) (same). That being so, she maintains that the plain meaning of "public building" in the statute is that the building is used for a public purpose, not that the building has the status of being open and accessible.

---

[5] The definition of public facilities has been amended since the trial in this case. *See* Act of May 26, 2013, 83d Leg., R.S., ch. 838, § 2, 2013 Tex. Gen. Laws 2181, 2182. The clause at issue was not amended and the parties agree that the amendments do not apply here.

[6] The court of appeals noted that Beeman argued only that prisons were public facilities based on the "public building maintained by any unit or subdivision of government" component of the definition, but she suggested during oral argument that the "other place of public accommodation" portion of the definition might apply. In this Court, Beeman affirmatively asserts that she is "not arguing that prisons are 'public accommodations' under Chapter 121."

We often look to dictionary definitions for the ordinary meaning of a term used in, but undefined by, a statute. *See, e.g.*, *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180-81 (Tex. 2013). But as the court of appeals pointed out, if the terms in the definition are read in isolation then the various dictionary definitions of "public building" and "public" support either of the competing constructions that the parties advocate. 408 S.W.3d at 577. For example, one of the dictionaries cited by Beeman included "[o]pen to all" and "open to common use" in the definition of "public," and "[a] building belonging to or used by the public for the transaction of public or quasi public business" in the definition of "public building." BLACK'S LAW DICTIONARY 1393 (rev. 4th ed. 1968). When an undefined term has multiple common meanings, we apply the definition that is most consistent with its use in the context of the statute. *$1,760.00*, 406 S.W.3d at 180-81. In other words, we give an undefined statutory term the meaning that is in harmony with and is consistent with relevant provisions of the statute. And when a word is used throughout a statute, we generally construe the statute to provide consistent meaning to that word. *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 643 (Tex. 2013).

In the definition of "public facility" in Chapter 121, the Legislature listed several types of places. Many of those places include the term "public"—a "*public* conveyance or mode of transportation," "a building to which the general *public* is invited," a "place where food is offered for sale to the *public*," "any other place of *public* accommodation . . . to which the general *public* or any classification of persons from the general *public* is regularly, normally, or customarily invited." TEX. HUM. RES. CODE § 121.002(5) (emphasis added). Based on the context of these phrases, we agree with the court of appeals that the Legislature used the term "public" to indicate a status of

8

openness and accessibility, and not a public use. Nothing in the definition of "public facility" indicates that the phrases using public as an adjective—"public conveyance" and "public accommodation"—are referring to facilities that serve only a public use. At the time Chapter 121 was enacted, "public" as an adjective was defined as "[p]ertaining to a state, nation, or whole community," and "[o]pen to all." BLACK'S LAW DICTIONARY 1393 (rev. 4th ed. 1968); *see also* BLACK'S LAW DICTIONARY 1422 (10th ed. 2014) (defining the adjective "public" as "[o]f, relating to, or involving an entire community, state, or country" or the condition of being "[o]pen or available for all to use, share, or enjoy"). We conclude that "public," when used as an adjective in the statutory definition, means open and accessible to the public.

Beeman also argues that the inclusion of "a college dormitory or other educational facility" in the definition of public facility demonstrates that the Legislature did not intend to limit the definition to places that are open and accessible, because a member of the public cannot simply enter a college dormitory or other educational facility. But the fact that the Legislature decided to specifically include college dormitories and educational facilities in the list with other facilities that are open and accessible indicates only that those are characterized as public facilities for the specific purpose of this statute, regardless of their accessibility and openness to the general public. Those inclusions do not indicate that the Legislature also intended to include prisons in the definition. Had the Legislature intended to include prisons, it could have easily said so, just as it specifically included dormitories and educational facilities. *See Lippincott v. Whisenhunt*, ___ S.W.3d ___, ___ (Tex. 2015) ("The plain language of the statute imposes no requirement that the form of the communication be public. Had the Legislature intended to limit the Act to publicly communicated

9

speech, it could have easily added language to that effect."); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen.").

Next, Beeman asserts that the court of appeals' construction of Section 121.002(5) reads language out of the statute. The definition of a public facility includes "a building to which the general public is invited." TEX. HUM. RES. CODE § 121.002(5). Beeman argues that this clause already includes a building that is open and accessible to the public regardless of whether it is maintained by the government. She then reasons that the court of appeals' reading renders the phrase "a public building maintained by any unit or subdivision of the government" surplusage. The Legislature, however, chose different phrases to apply to buildings maintained by the government and other buildings. In one phrase it used "a public building," and in the other "a building to which the general public is invited." We disagree that the two phrases have the same meaning.

Before passage of the Act, this Court explained that "one who maintains a merchandise establishment, or other public place, to which, by reason of the business so conducted thereon, the public is impliedly invited to enter, necessarily expects visitors at all times." *Carlisle v. J. Weingarten, Inc.*, 152 S.W.2d 1073, 1075 (Tex. 1941). But this implied invitation does not extend to private premises maintained for private purposes. *Id.* at 1076. In such a case, a premises owner only expects visitors that have been especially invited. *Id.* But nothing prohibits a premises owner who maintains premises for private purposes from extending an invitation to the general public to enter. The Legislature is presumed to have knowledge of relevant case law when it enacts statutes.

10

*In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012). Therefore, the Legislature's inclusion of buildings to which the general public has been invited includes privately owned buildings that are not public buildings because they are maintained for private purposes, but to which the premises owner has extended an invitation to the general public. This is not redundant of "a public building maintained by any unit or subdivision of the government." *See* TEX. HUM. RES. CODE § 121.002(5).

Beeman next argues that interpreting "public facilities" to include TDCJ prisons would be consistent with the legislative policies underlying Chapter 121. The Legislature stated in Chapter 121 that "[t]he policy of the state is to encourage and enable persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, to become gainfully employed, and to otherwise fully enjoy and use all public facilities available within the state." *Id.* § 121.001. Beeman points out that TDCJ provides multiple programs allowing inmates to participate in social and economic life which is consistent with TDCJ's mission statement to "promote positive change in offender behavior" and "reintegrate offenders into society." TEX. GOV'T CODE § 493.001. TDCJ's mission statement may be compatible with—or at least not incompatible with—the underlying purpose of Chapter 121 as expressed by the Legislature, but prison inmates manifestly are unable to participate fully in the social and economic life of the state, achieve maximum personal independence, or become gainfully employed. *See Retzlaff v. Tex. Dep't of Criminal Justice*, 135 S.W.3d 731, 742 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The fundamental purpose of a prison is to isolate its inhabitants from society . . . ."). Nor can they fully enjoy and use all public facilities in the State. So, in light of the inmates having only highly circumscribed freedoms, construing the Code to exclude TDCJ prisons does not frustrate the State's

11

express general goal of enabling persons with disabilities to participate fully in the social and economic life of the State. *See Tex. Workers' Comp. Comm'n v. Cont'l Cas. Co.*, 83 S.W.3d 901, 905 (Tex. App.—Austin 2002, no pet.) ("Statutes are to be interpreted and applied to achieve, not frustrate, the object sought to be attained by the legislature in enacting the statute.").

Beeman next argues that even accepting the proposition that a "public" facility under the Code must have the status of being "open and accessible" to the public, TDCJ prisons meet this definition because inmates are a subset of the public, and non-inmate members of the public routinely access TDCJ facilities. But as noted previously, "public" as an adjective is considered as referencing or "[p]ertaining to a state, nation, or whole community" and being "[o]pen to all." BLACK'S LAW DICTIONARY 1393 (rev. 4th ed. 1968); *see also* BLACK'S LAW DICTIONARY 1422 (10th ed. 2014) (defining "public" as a noun as "[t]he people of a country or community as a whole"). TDCJ inmates, however, are separated from and segregated from the community as a whole. *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (noting that criminal offenders are confined in facilities where they are "isolated from the rest of society").

But even assuming inmates are part of the public, nothing in the language of the statute indicates that the Legislature intended for one small subset of the public that is involuntarily segregated from the public and has seriously constricted freedoms (*i.e*. TDCJ inmates) qualifies as the "public"—the community as a whole. And as for the other members of the public who access TDCJ facilities, such as visitors and volunteers, we disagree that the phrase "public building" can be read so broadly as to include buildings that are generally inaccessible, even though the buildings or some part of them can be accessed in a limited, controlled manner by a small segment of the

12

public.  TDCJ volunteers must meet particularized eligibility requirements and be approved by the TDCJ.  Tex. Dep't of Criminal Justice, *Volunteer Services Program*, http://tdcj.state.tx.us/divisions/rpd/rpd_volunteer.html (last visited June 15, 2015).  Visitors must also be approved by the TDCJ, and may only visit at specified times.  TEX. DEP'T OF CRIMINAL JUSTICE, OFFENDER RULES AND REGULATIONS FOR VISITATION (2015), http://tdcj.state.tx.us/documents/cid/Offender_Rules_and_Regulations_for_Visitation_English.pdf (last visited June 15, 2015).  There are very few—if any—governmentally owned or controlled buildings that are not accessible to some subset of the public, even though frequently the members of that subset will have to meet particularized requirements for access.  Reading "public building" to include buildings used by some restricted, limited subsets of the general public or buildings with some of its parts open to limited subsets of the public would effectively render that term meaningless, because every building owned or controlled by a unit or subdivision of the government necessarily is open to some larger or smaller segment of the public and would be a public building.

Finally, Beeman argues that the federal Americans with Disabilities Act (ADA) is instructive in interpreting Chapter 121, and the ADA points toward requiring prison officials to accommodate her disability.  The argument is not well taken.

The ADA applies to a "[p]ublic entity" which includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(B). State prisons "fall squarely" within this definition. *Pa. Dep't of Corrs. v. Yesky*, 524 U.S. 206, 210 (1998).  While the Code's definition of "public facilities" was enacted in 1969, more than twenty years before the ADA was enacted in 1990, Beeman argues that the Legislature revised

13

Chapter 121 in 1997 to make the law compatible with the ADA. But the only changes to the definition of "public facilities" in the 1997 amendments were to make the nouns plural and two other minor wording edits. *See* Act of May 22, 1997, 75th Leg., R.S., ch. 649, § 2, 1997 Tex. Gen. Laws 2220 (amended 2013) (current version at TEX. HUM. RES. CODE § 121.002(5)). The language at issue in this case was amended only to make "building" plural. *Id.*

Beeman points to a statement by a state senator in a committee hearing to the effect that the 1997 changes were necessary to "make the state law relating to people with disabilities compatible to the ADA." Public Hearing on H.B. 2525 Before the Senate Health and Human Servs. Comm., 75th Leg., R.S. (May 14, 1997) (statement of Senator Mike Moncrief). But "[s]tatements made during the legislative process by individual legislators . . . are not evidence of the collective intent of the majorities of both legislative chambers that enacted a statute." *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011). And the minor wording changes in 1997 do not indicate legislative intent to change the definition of "public facilities" to include prisons. Moreover, the definition of "public facilities" in Chapter 121 has no similar counterpart in the ADA. Therefore, we look only to the text of Chapter 121 and not to cases interpreting the federal act. *See Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507-09 (Tex. 2012) (explaining that it is the province of the Legislature to determine whether to enact an exception similar to an exception in a federal act and "[f]or this Court to apply a nonanalogous federal statute . . . in the absence of legislative action would require us to abdicate our role as interpreters of the law in favor of a lawmaking function").

## IV. Conclusion

The court of appeals did not err in holding that TDCJ prisons are not "public facilities" under Chapter 121 and that Beeman failed to show Livingston acted ultra vires. We are confident that if the Legislature desires for prisons to fall within Chapter 121's definition of "public facilities" it will amend the statute to include them, just as it has already included several distinct categories of facilities.

We affirm the judgment of the court of appeals dismissing Beeman's suit for want of jurisdiction.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 26, 2015

15