**Opinion issued July 19, 2018**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

**NO. 01-16-00584-CV**

—————————————

**STEPHANIE MONTAGNE ZOANNI, Appellant**

**V.**

**LEMUEL DAVID HOGAN, Appellee**

---

**On Appeal from the 246th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-34811-B**

---

**DISSENTING OPINION**

"In construing [a] statute, we rely 'on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result.'"[1]

---

[1]     *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 563 (Tex. 2016) (quoting *Beeman v. Livingston*, 468 S.W.3d 534, 538 (Tex. 2015)).

"The common meaning of the term 'action' refers to an entire lawsuit or cause or proceeding, not to discrete 'claims' or 'causes of action' asserted within a suit, cause or proceeding."[2]

The majority errs in construing the plain language of the Texas Defamation Mitigation Act ("DMA").[3] Contrary to the majority's holding, appellee, Lemuel David Hogan, in bringing his defamation "*action*" against appellant, Stephanie Motangne Zoanni, did comply with the DMA's requirements and meet the statutorily-set deadline for compliance at the time that he filed his lawsuit. In misconstruing the plain text of the DMA, the majority further errs in "revers[ing] as to nine of the alleged instances of defamation at issue in this appeal," dismissing them, and ordering a new trial on only the remaining four statements. Accordingly, I respectfully dissent.

**Background**

On March 7, 2014, Hogan sent Zoanni a defamation-mitigation letter, demanding that she "(A) immediately cease and desist [her] unlawful defamation of David Hogan personally and professionally[,] (B) immediately cease and desist [her]

---

[2] *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563–64 (Tex. 2014) (citing *Action*, BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "action" as "[a] civil or criminal judicial proceeding")); *see also In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) ("A cause of action has been defined 'as a fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'") (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939)); *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995) ("The term 'action' is generally synonymous with 'suit,' which is a demand for one's rights in court.").

[3] TEX. CIV. PRAC. & REM. CODE ANN. §§ 73.051–.062 (Vernon 2017).

unlawful defamation of Brenda Hogan and Robert Hogan[,] (C) take down all social media posts referencing David Hogan, Brenda Hogan, and Robert Hogan, as well as the Spring First Church[, and] (D) provide . . . written assurance within five (5) days that [she would] cease and desist from further defamation of David Hogan's character and reputation." Hogan attached to his letter "two examples" of Zoanni "defaming" him. The first document is an email in which Zoanni, writing to the "General Secretary of the Assemblies of God Church," accuses Hogan, a youth pastor, of being "involved in child porn," "stalking," and "hitting on" teenage girls. The second document, from Zoanni's blog "Fight for Macy" and entitled "What a good dad DOES NOT do," was "one of many" blog posts in which Zoanni proceeded to "defame his character and reputation for the sole purpose of causing him public hatred, contempt, and ridicule within the community."

On March 21, 2014, Hogan's attorney sent to Zoanni's attorney an email with an attached Rule 11 letter agreement[4] that the parties had previously discussed. In the email, he explained that "[i]n lieu of sending 300 pages of [complained-of] blog postings, [he] included the [pertinent] web address." In the attached Rule 11 letter agreement, Zoanni specifically agreed to "not communicate with third parties, via talk, type, tweet, blog, email, text, or any other form of communication [regarding] David Hogan, Robert Hogan, Brenda Hogan, or the Spring First Church." In

[4] *See* TEX. R. CIV. P. 11 (Vernon 2003).

exchange, Hogan's attorney provided a copy of "the email letter referenced in the[ir] March 7, 2014 . . . letter" and the complained-of website address for Zoanni's blog.

Hogan, on March 27, 2014, filed a petition to modify the parent-child relationship ("original petition") regarding his and Zoanni's daughter, asserting claims against Zoanni for defamation, invasion of privacy, malicious prosecution, abuse of Child Protective Services ("CPS") processes, and intentional infliction of emotional distress. He also requested a permanent injunction to prevent Zoanni from communicating to third parties about him. Specifically, Hogan alleged that Zoanni had falsely represented to third parties, including CPS and law enforcement officers, that he "is a child molester, involved with child pornography, and otherwise is of poor character and mistreats women and children," including that he was "abusing" his daughter.

Approximately ten days before trial, on April 15, 2016, Hogan filed his seventh amended petition.[5] He dropped all of his claims except defamation, and he specifically "invoke[d] the [d]octrine of [r]elation [b]ack and the [e]ntire [c]ontroversy [r]ule." As in his original petition, Hogan claimed that Zoanni had falsely told third parties that he "is a danger to children, [is] involved in child

---

[5]     Zoanni does not argue on appeal that the amended pleading was untimely. *See* TEX. R. CIV. P. 63 (Vernon 2003) (requiring an amended pleading to be filed "within seven days of the date of trial" or within "such time as may be ordered by the judge under Rule 166").

4

pornography, belongs on a pedophile list, and otherwise is of poor character and sexual[ly] mistreat[ed] children." However, Hogan did, in his amended petition, under his defamation cause of action, include additional defamatory statements that he had not identified as such in his original petition.

At no time in the trial court below did Zoanni request an abatement as provided for in the DMA.[6] Nor did she ever file special exceptions[7] to complain of Hogan's pleadings. Instead, Zoanni, prior to voir dire of the jury panel, filed a motion for directed verdict, asserting that Hogan had failed to comply with the DMA's "statutorily sufficient written notice for any claim of defamation."[8] The trial court subsequently denied Zoanni's motion.

In its charge to the jury, the trial court, in Questions 1, 7, and 9, asked the jury whether numerous specific statements made by Zoanni to certain individuals, in certain Facebook posts, in certain blog posts, to certain law enforcement officers, and in certain police incident reports were "false when each statement was made." The jury answered "Yes" for each statement listed. In Question 2, the trial court asked the jury whether Zoanni knew or should have known that certain statements

---

[6]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.062.

[7]     *See* TEX. R. CIV. P. 91 (Vernon 2003).

[8]     Notably, the DMA does not require a plaintiff to send a defendant written "notice," but instead provides that a plaintiff must send a defendant a written request for correction, clarification, or retraction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.055(a).

5

made by her were false and had the potential to be defamatory. The jury answered "Yes" for each statement listed. And in Questions 6 and 8, the trial court asked the jury whether certain statements made by Zoanni were defamatory. The jury answered "Yes" for each statement listed.

In Question 10, the trial court asked the jury "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate . . . Hogan for his damages, if any, that were proximately caused by [the] statements which [it] answered 'Yes' to in answer to Questions 2, 7, or 9." The trial court then set forth two groups of statements in the charge as follows:

## PART A

Original Facebook Post by Stephanie Zoanni

a. "Stephanie Montagne shared a status . . . Growing concerns for my baby girl! . . . What a good dad DOES NOT do: He doesn't film young girls in his youth group going to the bathroom and getting into the shower thru the bathroom air vent in his house (caught and admitted to) . . . [.]"

Correspondence from Stephanie Zoanni to Tim Barker

b. "David Hogan still has severe issues . . . [.] Please tell me if you think it[']s right that a minister who is involved in child porn is put back into a church as children[']s pastor after one year visiting another pastor once a month and an online course as his rehab??"

c. "David Hogan still has severe issues . . . [.] There is an open Sex Crimes case with Harris County Precinct 4, Case number 13-09077. . . . I filed a report on him last summer."

6

Police Incident Report with Harris County Constable, Pct. 4, Case No. 13-098077

d. "DATE:        7/18/2013    . . . REPORTEE1:    MONTAGNE, STEPHANIE   LYNN . . . SUSPECT   1:   HOGAN,   LEMUEL DAVID . . . Ms. Montagne feels strongly there is child pornography on David's computers."

e. "DATE: 7/18/2013 . . . REPORTEE1: MONTAGNE, STEPHANIE LYNN . . . SUSPECT 1: HOGAN, LEMUEL DAVID . . . She also feels that her daughter Macy is hiding some kind of sexual assault and will [']flip['] when asked about it."

f. "DATE: 7/18/2013 . . . REPORTEE1: MONTAGNE, STEPHANIE LYNN . . . SUSPECT  1:  HOGAN,  LEMUEL  DAVID . . . Ms. Montagne stated her ex-husband admitted to placing cameras in the air vents and had watched Sarah when she was 14 y/o."

Email from Stephanie Zoanni to Detective Russell Ackley

g. ["]David Hogan . . . it was quite possible he was involved in child porn but we had no proof whatsoever that he is . . . Stephanie Montagne 281-[xxx]-[xxxx]."

Correspondence from Stephanie Zoanni to Dr. Edralin

h. "Macy Hogan will no longer be a patient of STEP Pediatrics . . . her dad . . . [.] And please for the love of God, when you have been informed that a father is a pedophile . . . DO NOT encourage him to sit in on a meeting where you are discussing breasts and pubic hair!"

## **PART B**

Stephanie Zoanni Blog-My Spring Story Feb[.] 4, 2014 – April 2, 2014

a. "[]In my Facebook blast I did several weeks ago[,] I said he was caught and admitted to the camera in the bathroom.  Let me be 100% clear, he was guilty, but did not admit to the camera in the bathroom[,] but I know it was there . . . [.]"

b. "How does a pedophile . . . get any custody, much less 6 days at a time, of his daughter?"

c. "It was YOUR daughter (who just turned 9) who was drug to a doctor appointment scheduled . . . to discuss her breast development and puberty!  They sat YOUR baby girl on the exam table with complete embarrassment all over her little face, and the doctor grabbed her breasts and examined her lower regions with three men in the room including a confessed . . . pedophile?"

d. "WHAT'S WRONG?  YOU JUST HUMILIATED MY DAUGHTER AND ME IN FRONT OF HER . . . PEDOPHILE FATHER AND HIS RIDICULOUS MOTHER!"

e. "This must have really upset both Chester and Belinda because from this point on overly sappy sweet Belinda was very cold to me.  Yes your son has a problem with pre-teens and it's sickening, so make him children's pastor at Spring First Church!"

In answer to Part A, the jury awarded Hogan $500,000.00 for "[i]njury to reputation sustained in the past," $100,000.00 for "[i]njury to reputation that, in reasonable probability, . . . Hogan will sustain in the future," $250,000.00 for "[m]ental anguish sustained in the past," and $50,000.00 for "[m]ental anguish that, in reasonable probability, . . . Hogan will sustain in the future."

In answer to Part B, the jury awarded Hogan $650,000.00 for "[i]njury to reputation sustained in the past," $200,000.00 for "[i]njury to reputation that, in reasonable probability, . . . Hogan will sustain in the future," $250,000.00 for "[m]ental anguish sustained in the past," and $100,000.00 for "[m]ental anguish that, in reasonable probability, . . . Hogan will sustain in the future."

8

In Question 11, the trial court asked the jury if it found, by clear and convincing evidence, that the harm to Hogan "resulted from malice" by Zoanni. Although the jury unanimously answered "yes" to this question, it did not award Hogan any exemplary damages.

## Standard of Review

As noted by the majority, the construction of a statute is a question of law that we review de novo. *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016). "In construing the statute, we rely 'on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result.'" *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 563 (Tex. 2016) (quoting *Beeman v. Livingston*, 468 S.W.3d 534, 538 (Tex. 2015)). And we presume that the entire statute is intended to be effective. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001).

## Defamation Mitigation

In her first issue, Zoanni argues that the trial court erred in denying her motion for directed verdict because Hogan "fail[ed] to comply with the [DMA] on numerous statements or events never mentioned in [his] notice letter, but [which were] submitted to the jury and result[ed] in adverse findings, requir[ing] a reversal and a rendition on those matters." Specifically, Zoanni asserts that "for 9 of the 13"

statements at issue, Hogan "never complied with the [DMA] notice requirement and therefore *the suit cannot be maintained*." (Emphasis added.)

As an initial matter, it is important to note that the DMA, contrary to Zoanni's assertion throughout her brief, does not require a plaintiff to send a defendant a "notice" letter. Moreover, in her brief, Zoanni does not expressly state which "9 of 13" statements she complains about on appeal. However, even assuming that Zoanni has preserved her first issue for our review,[9] it is without merit.

To recover on his defamation claim, Hogan was required to prove that (1) Zoanni published a factual statement (2) that was capable of defamatory meaning (3) concerning Hogan (4) while acting with negligence concerning the truth of the statement. *See WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

---

[9]     In her brief, Zoanni asserts that Hogan's March 2014 letter "fail[ed] to give any notice of the claims submitted to the jury" regarding:

- The July 2013 police report (3 claims);
- An email to Detective Ackley (1 claim);
- Other comments in the blog (4 claims); and
- One letter to Dr. Edralin (1 claim)

However, she never specifically identifies which statements listed in the trial court's charge to the jury that she is complaining about. *See* TEX. R. APP. P. 38.1(f) ("brief must state concisely all issues or points presented for review"), (i) ("brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

The DMA applies to Hogan's defamation *action*. TEX. CIV. PRAC. & REM. CODE ANN. §§ 73.051–.062 (Vernon 2017). In a section entitled, "Request for Correction, Clarification, or Retraction," the DMA states that:

(a) A person may *maintain an action* for defamation only if:

    (1) the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant; or

    (2) the defendant has made a correction, clarification, or retraction.[10]

*Id.* § 73.055(a) (emphasis added). Such a request is timely if it is "made during the period of limitation for *commencement of an action* for defamation," which is one year after the day the cause of action accrues. *Id.* § 73.055(b) (emphasis added); *see also id.* § 16.002(a) (Vernon 2017) (setting forth one-year statute of limitations for

---

[10] The DMA also states that a request is sufficient if it:

    (1) is served on the publisher;

    (2) is made in writing, reasonably identifies the person making the request, and is signed by the individual claiming to have been defamed or by the person's authorized attorney or agent;

    (3) states with particularity the statement alleged to be false and defamatory and, to the extent known, the time and place of publication;

    (4) alleges the defamatory meaning of the statement; and

    (5) specifies the circumstances causing a defamatory meaning of the statement if it arises from something other than the express language of the publication.

*Id.* § 73.055(d).

defamation actions). Unlike it did in the Healthcare Liability Act, the Legislature did not include in the DMA a provision requiring the mandatory dismissal of an action for a plaintiff's failure to provide a defendant with a written request for correction, clarification, or retraction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(2) (Vernon 2017). Rather, if a defendant "does not receive a written request for a correction, clarification, or retraction," she may file a plea in abatement not later than the 30th day after the date she files an original answer. *Id.* §73.062. Moreover, the ultimate remedy for a defendant when a plaintiff fails to timely provide a defendant with a written request for a correction, clarification, or retraction is the prohibition of recovery of exemplary damages. *See id.* § 73.055(c); *see also Hardy v. Commc'n Workers of Am. Local 6215*, 536 S.W.3d 38, 47 (Tex. App.—Dallas 2017, pet. denied).

The majority agrees with Zoanni that Hogan "did not comply with and, at all relevant times, could no longer have complied with the [DMA] with respect to 9 of the 13 allegedly defamatory statements at issue" and his "failure to comply with the [DMA] bars his recovery as to these statements." In doing so the majority holds that for Hogan to "*maintain an action* for defamation as to each statement at issue, he was required to send—within a year of each statement's publication—a request for correction, clarification, or retraction that identified, with particularity, *[each] allegedly defamatory statement*." (Emphasis added.) It asserts that Hogan "did not

12

timely satisfy this requirement and, by the time of the charge conference, he could no longer do so." The majority further reasons:

> Only 4 of the 13 statements included in the jury charge met the statutory requirements. On March 7, 2014, Hogan asked Zoanni to retract three statements, and Zoanni independently corrected one other statement. Zoanni concedes that the DMA was satisfied for these four statements.

What the majority fails to acknowledge in its opinion and reasoning is the critical fact that Zoanni did not in the trial court below, and does not on appeal, challenge the defamation allegations in Hogan's original petition or that he satisfied the DMA requirements in regard to those allegations. Thus, the instant action was properly filed and maintained pursuant to the DMA. After the case had been pending for over a year, and more than seven days before trial, Hogan amended his petition to seek damages for additional defamatory statements made by Zoanni. These additional defamatory statements concern the same subject matter as the defamation allegations in his original petition about which Zoanni did not in the trial court below, and does not on appeal, complain.[11]    Hogan then presented evidence

---

[11]    It is not clear from the record exactly when Hogan learned of these additional defamatory statements. However, in his March 7, 2014 defamation-mitigation letter, he specifically requested that Zoanni cease and desist all defamation of his character and, among other things, "take down all social media referencing" him. He also attached "two examples" of Zoanni's alleged defamation of his character. At that point, Zoanni was clearly "on notice" of the subject matter of his defamation claim against her.

13

establishing these statements at trial, the trial court included them in its charge to the jury, and the jury found all of the statements to be defamatory.

Nothing in the plain text of the DMA required Hogan, after he had already complied with the DMA in bringing and maintaining this action for defamation, to, as suggested by the majority, "send [yet another] request[] for correction, clarification, or retraction that identifie[s], 'with particularity,'" each additional defamatory statement. This interpretation will lead to absurd results. It will ultimately deprive a plaintiff, without any indication of legislative intent to do so, of recovery for damages in a situation where the plaintiff amends his petition to add defamatory statements he learns of only during the discovery process.

The majority's erroneous reasoning and holding stem from its misunderstanding and misuse of the term "action." It errs in treating each defamatory statement alleged in Hogan's seventh amended petition as a discrete and distinct "claim" or "cause of action" in and of itself. However, the Texas Supreme Court has made it crystal clear that when the term "action" is not defined in a statute, we are to give it the "common, ordinary meaning." *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563–64 (Tex. 2014); *see also, e.g., Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). And the "common meaning of the term 'action' refers to *an entire lawsuit* or *cause* or *proceeding*, not to discrete 'claims' or 'causes of action'

14

asserted within a suit, cause or proceeding." *Jaster*, 438 S.W.3d at 563–64 (emphasis added) (citing *Action*, BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "action" as "[a] civil or criminal judicial proceeding")); *see also In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) ("A cause of action has been defined 'as a fact or facts entitling one to institute and maintain an action, which must be alleged and proved to in order to obtain relief.'" (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939)); *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995) ("The term 'action' is generally synonymous with 'suit,' which is a demand of one's rights in court.").

Moreover, as noted above, a plain reading of the DMA reveals that the remedy for a plaintiff's failure to request a correction, clarification, or retraction of a defamatory statement is not dismissal, as the majority holds,[12] but instead is for prohibition of recovery of exemplary damages. *See Hardy*, 536 S.W.3d at 47 ("[I]f a defendant who did not receive a request for correction, clarification, or retraction could simply seek dismissal of the action, there would be no need for either the limitation of damages or abatement provisions in the statute . . . and the purpose of the statute would be frustrated.") (internal citations removed); *see also Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 812 (Tex. App.—Austin 2017, pet. filed)

---

[12] Instead of using the word "dismissal," the majority characterizes the DMA as not allowing defamation claims to "proceed." However, the effect of the majority's holding is the same as reading into the statute a mandatory dismissal that does not exist.

15

(agreeing with court's analysis in *Hardy*, holding plaintiff not "required to establish a prima facie case of demand pursuant to Section 73.055 as an essential element of his defamation claim when resisting a . . . motion to dismiss"). If the Legislature had wanted to include a mandatory dismissal provision in the DMA, it could have expressly done so like it did in the Healthcare Liability Act. It did not. Why? Because the purpose of the DMA is to provide a method for a person who has been defamed to mitigate their damages, not to preclude their recovery. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.052.

The bottom line is that once Hogan, in compliance with the DMA, filed the instant *action*, this *lawsuit*, against Zoanni, he was free, under the Texas Rules of Civil Procedure, to amend his pleadings[13] and seek damages for any and all additional defamatory statements made by Zoanni. All of the additional, specific defamatory statements referenced in Hogan's seventh amended petition and in Question 10, Parts A and B, of the jury charge relate to the same subject matter as the two "example" statements referenced in Hogan's March 7, 2014 defamation-mitigation letter. Thus, Hogan fulfilled the purpose of the DMA by attempting to mitigate his damages. Further, after Hogan filed this action against her, Zoanni did not seek an abatement, request a continuance, or file special exceptions in response

---

[13]     *See* TEX. R. CIV. P. 63.

16

to any of Hogan's pleadings. And she cannot logically argue that she was not aware that these statements would be in issue at trial.[14]

Moreover, on March 21, 2014, Hogan's attorney sent to Zoanni's attorney an email attaching a Rule 11 letter agreement[15] that the parties had previously discussed. In the email, he explained that "[i]n lieu of sending 300 pages of [complained-of] blog postings, [he] included the [pertinent] web address." In the Rule 11 letter agreement, Zoanni specifically agreed to "not communicate with third parties, via talk, type, tweet, blog, email, text, or any other form of communication [regarding] David Hogan, Robert Hogan, Brenda Hogan, or the Spring First Church." In exchange, Hogan's attorney provided a copy of "the email letter referenced in the[ir] March 7, 2014 . . . letter" and the complained-of website address for Zoanni's blog.

---

[14] As noted above, contrary to Zoanni's assertions throughout her brief, the DMA does not require a plaintiff to send a defendant a "notice" letter. The purpose of a plaintiff's request for correction, clarification, or retraction is to mitigate the plaintiff's damages, not to provide "notice" before suit. But, to the extent that the DMA could be read as requiring a "notice" letter, Zoanni cannot complain that she was not on notice of the defamatory statements alleged in Hogan's seventh amended petition. Indeed, at oral argument, Zoanni's attorney acknowledged that he knew about the complained-of statements during the discovery process. And from the record, he knew of at least "300 pages of blog postings" that Hogan complained of at the time that the parties entered the Rule 11 agreement based on the March 21, 2014 email. Zoanni's attorney also conceded at oral argument that many of the statements at issue had been raised under separate causes of action in Hogan's original petition.

[15] *See* TEX. R. CIV. P. 11.

17

## Conclusion

Accordingly, unlike the majority, I would hold that the trial court did not err in denying Zoanni's motion for directed verdict, overrule Zoanni's first issue, and proceed to address her second, fourth, and fifth issues. Like the majority, I would overrule Zoanni's third issue.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Caughey.

Jennings, J., dissenting.