

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00085-CV
_____


MICHAEL C. HOWARD AND VIRGINIA D. HAMILTON, Appellants

V.

MATTERHORN ENERGY, LLC, AND MIKE CHERRY, Appellees


---

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 19-0998

---


Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

O P I N I O N

Michael C. Howard and Virginia D. Hamilton appeal the trial court's denial of their motion to dismiss counterclaims filed by Matterhorn Energy, LLC, and Mike Cherry under the Texas Citizenship Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011.[1]

We conclude that the TCPA does not apply to counterclaims based on communications directly made to third parties or to the breach of contract counterclaim and, as a result, affirm the trial court's judgment denying the TCPA dismissal on these counterclaims. Even so, we find that the TCPA applies to, and the judicial proceedings privilege bars, counterclaims based on communications made in this lawsuit and in a related lis pendens and reverse the portion of the trial court's judgment that failed to dismiss these claims.

I.      **Factual and Procedural Background**

Howard and Hamilton (collectively Lessors) own approximately 46.75 percent of the mineral rights in 1,183.585 acres of land that is considered Tier 1 of the Haynesville Shale Play located in Harrison County, Texas (the Property). They were approached by Kyle R. Mayden, a broker for Matterhorn Energy, LLC, and Mike Cherry (collectively Lessees) for the purpose of negotiating a lease for mineral rights to the Property. Because Lessors "were only interested in leasing their minerals to an operator that had the necessary experience [and] financial wherewithal to fully develop the mineral[s]," Lessees allegedly made the following

---

[1]Substantial revisions to the TCPA became effective on September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Sess. Law Serv. 684 (codified at TEX. CIV. PRAC. & REM. CODE §§ 27.001, .003, .005–.007, .0075, .009–.010). This lawsuit was filed on September 25, 2019.

2

representations to induce the deal: (1) that Lessees had the funding to drill and develop eight to ten 3,000-acre prospects; (2) that Lessees would drill and develop all production horizons on the leasehold and would execute a full-scale development plan; (3) that Lessees would not flip the lease during the primary term; (4) that Lessees would drill at least one well each year during the primary term of the lease; and (5) that Lessees would pay Lessors $100,000.00 for each well they failed to drill during the primary term. In reliance on these terms, a lease agreement was executed on November 28, 2017, (the Lease Agreement) which contained a primary term of three years, unless extended. In relevant part, the Lease Agreement contained a "CONTINUOUS DELVELOPMENT COMMITMENT," which stated:

(A) Notwithstanding any provisions to the contrary herein, if LESSEE has drilled three (3) wells provided for below, and if on or before the expiration of the primary term as described herein, Lessee is engaged in the actual drilling of a well on the leased premises, or on lands pooled therewith, or shall have completed such a well (either as a well capable of producing or as a dry hole), this lease shall continue in force as to all depths covered hereby and it shall not terminate as to any such depths for as long as Lessee prosecutes operations with due diligence on said well or commences the drilling of another well within one hundred and eighty (180) days after so completing such prior well and, thereafter, commences continuing drilling operations on succeeding wells within one hundred and eighty (180) days after the completion or plugging and abandonment of any prior well.

(B) Lessee does hereby agree to commence drilling operations on an initial (1st well) Test Well within 12 months of the Effective Date herein; should Lessee fail to begin drilling efforts of the Test well thereon, Lessee shall pay to Lessors herein a sum of $100,000.00 as a penalty; which penalty amount shall be divided among the Lessors in proportion to the actual Net Mineral Interest ownership of each Lessor to the total acreage Leased herein.

(C) Lessee does hereby agree to commence drilling operations on the second (2nd well) Test Well within twenty-four (24) months of the Effective Date herein; should Lessee fail to begin drilling efforts of the Test well thereon, Lessee shall pay to Lessors herein a sum of $100,000.00 as a penalty; which penalty amount

3

shall be divided among the Lessors in proportion to the actual Net Mineral Interest ownership of each Lessor to the total acreage Leased herein.

(D)     Lessee does hereby agree to commence drilling operations on an additional (3rd well) Test Well within 36 months of the Effective Date herein; should Lessee fail to begin drilling efforts of the Test well thereon, Lessee shall pay to Lessors herein a sum of $100,000.00 as a penalty; which penalty amount shall be divided among the Lessors in proportion to the actual Net Mineral Interest ownership of each Lessor to the total acreage Leased herein.

Paragraph 9 of the Lease Agreement contained the following notice provisions and prerequisites

to suit:

In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract.  Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor.  The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee.

On February 6, 2019, an amendment to the Lease Agreement kept provision (A) of the

Lease Agreement, deleted provision (D), and modified provisions (B) and (C) as follows:

(B)     Lessee does hereby agree to commence drilling operations on the First (1st) and Second (2nd well) Test Wells before December 1, 2019, should Lessee fail to begin drilling efforts of the First (1st) and/or the Second (2nd) Test Wells, before December 1, 2019, Lessee shall pay to Lessors herein a sum of $100,000.00 as a penalty for each Test Well that Lessee fails to begin drilling efforts on as per the provisions of this section 19[] herein; which penalty amount shall be divided among the Lessors in proportion to the actual Net Mineral Interest ownership of each Lessor to the total acreage Leased herein.

(C)     Lessee does hereby agree to commence drilling operations on an additional (3rd well) Test Well within 36 months of the Effective Date of the Original Lease should Lessee fail to begin drilling efforts of the Test well thereon, Lessee shall pay to Lessors herein a sum of $100,000.00 as a penalty; which penalty amount shall be divided among the Lessors in proportion to the actual Net Mineral Interest ownership of each Lessor to the total acreage Leased herein.

4

As a result, the amendment gave Lessees two years to drill both the first and second wells.

According to Cherry's affidavit, he told Lessors before the lease was executed that he would "solicit funds from individual investors, as needed, to fund the drilling program." "After the . . . [Lease Agreement] was executed, gas prices dropped and were too low to drill an economical well on the [Property], or Matterhorn's other leases in the Haynesville area. Therefore, Matterhorn decided to exercise its right to sell all of its lease interests, including the . . . lease" covered by the Lease Agreement.

On September 25, 2019, before the Lease Agreement's term expired and before any penalties under the Lease Agreement were due, Lessors sued Matterhorn Energy, LLC, and its president, Cherry (collectively Matterhorn), for common-law fraud, fraud by non-disclosure, negligent misrepresentation, and breach of contract, among other things, and sought both damages and recission of the Lease Agreement. The gravamen of Lessors' complaints focused on the lack of drilling and development activity by Matterhorn. On September 26, Lessors filed a notice of lis pendens that provided notice of the lawsuit, said that Lessors sought recission of the Lease Agreement, and claimed, "The action is for a declaration that the Leases purporting to encumber the Property are void as a matter of law and are of no force and effect on the Property."

Because the lawsuit was filed before the expiration of the lease term, Lessees counterclaimed for breach of the Lease Agreement and its notice provisions, for anticipatory breach, and for equitable estoppel on Lessors' alleged representations that they would give Matterhorn three years to develop and market oil, gas, and other minerals on the Property.

5

Lessees argued that force majeure provisions absolved them of liability because of unforeseen complications like the inability to obtain pipelines and other methods to transport oil, gas, and other minerals. For example, Lessees alleged that Lessors were informed that Matterhorn had to obtain a commitment from a mid-stream high pressure gas purchaser to lay a pipeline across the Property to secure a market for the gas. Because the earliest commitment Lessees could secure was in 2020, they informed Lessors that there was no market for the gas and that an event of force majeure occurred that excused them from the continuous drilling provision. Lessees answered that Cherry could not be sued in his individual capacity and included a statutory claim to expunge Lessors' lis pendens as wrongful pursuant to Chapter 12 of the Texas Property Code.

Lessees also included facts and counterclaims that triggered Lessors' TCPA dismissal motion. Their counterpetition stated that Matterhorn contracted with EnergyNet.com, LLC (EnergyNet), on September 9, 2019 (the Sales Agreement), to market its production and put up its interest in the lease for sale when Lessors allegedly became aware of a proposed sale and attempted to intervene by filing a lawsuit and a notice of lis pendens. Lessees claimed that Howard had made false misrepresentations to third parties about Matterhorn before the litigation was filed and alleged that Lessors contacted other parties and spoke with them about their efforts to terminate the Lease Agreement. Lessees claimed that Howard called Mayden before the lawsuit was filed and alleged that Howard "told Mayden that he had been approached by Rockcliff Energy who offered to lease and drill up their mineral acreage position, if they would get the lease[] away from Matterhorn." The counterpetition alleged that Lessors interfered with Matterhorn's contract with EnergyNet to market the lease by filing the lawsuit and lis pendens,

6

which "forced [Matterhorn] to terminate" the Sales Agreement "due to third parties withdrawing their interest in developing the area," and prevented the sale of its interest. Lessees alleged that, as a result, no one bid on their offer of sale and EnergyNet decided not to market Matterhorn's production.

As a result of pre-suit "communication[s] with third parties regarding the leased acreage," pre-suit "verbal[] . . . accusations to prospective buyers" of Matterhorn's interest in the Property, and the alleged wrongful lis pendens, Matterhorn filed counterclaims for tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement. As for damages, the counterpetition said that the lawsuit and lis pendens injured Lessees "due to their inability to market the leased properties or explore and develop the property under the lease" and that they "incurred and continue[d] to incur damages as a result in the form of loss of time and expense under the subject lease" and the fact that [Lessees] were holding "1100 of leased acres that [were] effectively . . . worthless."[2]

Lessors moved to dismiss Lessees' breach of contract, tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement counterclaims under the TCPA on the ground that those claims were based on the filing of Lessors' petition and lis pendens and invoked their exercise of the right to petition the courts for relief.[3] Lessors also argued that they "establishe[d] an affirmative defense . . .

_____

[2]Lessors added that "the primary terms of the Lease continue to run, which will result in additional damages" under the Lease Agreement.

[3]The TCPA dismissal motion did not include a motion to dismiss Lessees' claim for expungement or cancellation of the lis pendens under Chapter 12 of the Texas Property Code.

entitl[ing them] to judgment as a matter of law," namely that the counterclaims were barred by the judicial proceedings privilege. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).

In response to the TCPA dismissal motion, Lessees argued that the communications forming the basis of their claims were among private parties, not the public, and occurred prior to the filing of the litigation on September 25, 2019. In support, Lessees' pleading attached Cherry's affidavit and Howard's deposition, which included additional, relevant facts gathered during discovery. Cherry's affidavit stated that, when Matterhorn approached EnergyNet in August 2019, "gas prices were $2.56 mcf and falling" and "EnergyNet represented to Matterhorn that it had closed three recent individual sales of Haynesville acreage positions of similar size to that held by Matterhorn," and had agreed to market the lease. The counterpetition stated that, after the Sales Agreement was executed between Matterhorn and EnergyNet, "EnergyNet established a data room for potential bidders and advertised the sale of the Matterhorn Lease[] to oil and gas producers via web posting, email and phone calls." "EnergyNet informed Matterhorn it had received significant interest in the acreage from operators and believed it would receive offers in excess of those EnergyNet had sold recently in the same area, which ranged from $2500–$3000/acre."

Howard's deposition showed that he "became aware that . . . Mr. Cherry had reached out to Internet to flip the acreage" because his friend, "Jibb Bibb, saw their advertisement" and passed it along to him. His deposition showed that Howard spoke with others before the lawsuit was filed about Matterhorn's interests, including Ed Abel, General Counsel for Rockcliff Energy, who was also evaluating Matterhorn's acreage. Howard's son, Nicholas Howard, is the

8

chief petroleum engineer for "El Capitan in the Permian" and said Cherry was "clueless" in August 2018. Howard said that he talked to Charles Trice, his neighbor, and Ross Brown, one of the mineral owners in the underlying lease who also "does all the site work for Rockcliff," and that they "all came to the consensus that Mr. Cherry is nothing but a fraud and he deserved to be sued." He also referred to conversations with Brown and Pinky Palmer discussing how Cherry "just doesn't get it" because he wanted to amend "the amount of the penalty and royalty and all this stuff after [they] . . . had an understanding."

When asked if he had talked to other companies, Howard said, "[W]e want[ed] to get our minerals leased, we want to get ourself developed. I've talked to other people about our . . . minerals and that . . . we know Cherry is not going to do anything . . . . So we talked to people about leasing." Howard testified that he spoke to Wes Thompkins of NextEra about purchasing the lease and told NextEra the lease would soon be available because "Cherry is not going to do anything, he doesn't have the wherewithal to." Howard testified that Rockcliff was "drilling all over the place" and that he talked to "a friend . . . that works at . . . Rockcliff," Abel. Howard asked Abel if Rockcliff would be interested in the lease, and Abel said that he "talked to his people, and they'd already looked at it." According to Howard, Abel said, "Cherry had already been knocking on their door, and they had already told him no." Yet, September 23, 2019, emails from Rockcliff Energy employees before the lawsuit and lis pendens were filed showed that Rockcliff knew that NextEra was also interested in the acreage and that Rockcliff was considering making an offer. The email, titled "Matterhorn Energy - East Texas Haynesville Shale Opportunity" showed that EnergyNet's invitation for bids, which were due October 11,

9

2019, was forwarded among Rockcliff employees who believed it would "make sense to throw in a lowball" offer. Abel admitted to having those conversations with Howard, but claimed they were privileged.

Howard admitted that Lessors filed the lawsuit and lis pendens before the expiration of the lease term and before any penalties under the lease were due to "put . . . a drain on" Matterhorn trying to develop acreage and affect Lessees' ability to "flip" the lease. Howard indicated that, after the lawsuit and lis pendens were filed, NextEra was interested in the property and was offering Howard "1500 bucks an acre" on a property next door. He further indicated that he felt "there was a little -- that there was some room in that."

Cherry's affidavit stated that (1) "Rockcliff Energy was the leading operator that was most aggressively evaluating Matterhorn's acreage in the EnergyNet data room, but once the lawsuit and notice of lis pendens were filed, Rockcliff withdrew from the EnergyNet evaluation and declined to submit a bid"; (2) "Mike Howard was well aware at the time that the lawsuit and Notice of Lis Pendens were filed that prospective buyers were reviewing information regarding the Howard Family Leases and other leases Matterhorn had for sale"; and (3) "As a part of such due diligence, the buyers would have reviewed the land records and been made aware of the Plaintiffs' lawsuit."

Lessees also filed a sworn declaration and report from William D. Farrar, an oil & gas adjunct professor at Baylor Law School. Farrar stated that the lis pendens informed the public that the lawsuit sought recission of the oil and gas leases and that "[a]ny person familiar with the customs and practices of the oil and gas industry knows, or should know, that filing the lawsuit

and Lis Pendens involving the mineral title destroys the marketability of the mineral property that is subject to the lawsuit and the Lis Pendens." According to Farrar, the lis pendens misrepresented the allegations and relief in the lawsuit, contained diametrically opposed positions that the lease was "valid, and subject to recission, or 'voidable' and was "void as a matter of law," and that no reasonable prospective purchaser would purchase the lease with the claims in the lawsuit pending. As a result, Farrar stated that allegations in the lis pendens "destroy[ed] the very object of the [Sales Agreement] itself, that is to sell the" lease. Farrar added, "The filing of the lawsuit and Lis Pendens has caused Defendant Matterhorn damages. The measure of damages would be, at a minimum, the diminution in the value of the Lease between the date it was marketed for sale, September 9, 2019, and its present value."

After a hearing, the trial court denied Lessor's TCPA motion to dismiss.

## II. Standard of Review and Applicable Law

> The purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."

*Martin v. Hutchison*, No. 06-19-00093-CV, 2020 WL 6788243, at *4 (Tex. App.—Texarkana Nov. 19, 2020, pet. filed) (mem. op.) (quoting *MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 938 (Tex. App.—Tyler 2019, pet. denied) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.002))). To effectuate this dual purpose, the TCPA provides a mechanism for early dismissal "[i]f a legal action is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a).

11

The TCPA "requires a three-step decisional process." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019). "Under the first step, '[t]he party moving for dismissal has the initial burden to establish by a preponderance of the evidence "that the legal action is based on . . . or is in response to the party's exercise of" the right of free speech, the right to petition, or the right of association.'" *Martin*, 2020 WL 6788243, at *4 (quoting *Henderson*, 592 S.W.3d at 939 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b))). "If the movant makes this showing, under the second step, 'the burden shifts to the nonmovant to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question."'" *Id.* (quoting *Henderson*, 592 S.W.3d at 939 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c))). Under the third step, even if the nonmovant makes such a showing, "the court shall dismiss a legal action against the moving party if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). When determining whether to dismiss the legal action, "the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). "However, the plaintiff's pleadings are usually 'the best and all-sufficient evidence of the nature of the action.'" *BusPatrol Am., LLC v. Am. Traffic Sols., Inc.*, No. 05-18-00920-CV, 2020 WL 1430357, at *3 (Tex. App.—Dallas Mar. 24, 2020, pet. denied) (mem. op.) (quoting *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017)).

As a threshold issue involving statutory construction, we must first decide whether the TCPA applies. *Martin*, 2020 WL 6788243, at *5. "In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *Id.* (quoting *State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018)).

"The text of the TCPA dictates the outcome of this case[, and w]e consider issues of statutory construction *de novo*." *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 132). As a result, "[w]e consider de novo the legal question of whether the movant has established by a preponderance of the evidence that the challenged legal action is covered by the TCPA." *Id.* (quoting *Henderson*, 592 S.W.3d at 939 (citing *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.))). "Although we construe the TCPA liberally 'to effectuate its purpose and intent fully,' it 'does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case or common law or rule provisions.'" *Id.* (quoting *Henderson*, 592 S.W.3d at 938–39 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.011)).

"It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written." *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 133) (quoting *In re Tex. Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 614 (Tex. 2006) (orig. proceeding) (citation omitted)). Thus, "[a]s with any statute, courts must apply the TCPA 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 133) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009)). "This means enforcing 'the plain meaning of the

13

text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result.'" *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 133) (quoting *Beeman v. Livingston*, 468 S.W.3d 534, 538 (Tex. 2015)). "The TCPA 'assigns detailed definitions to many of the terms it employs, and we must adhere to statutory definitions.'" *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 133) (quoting *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018)). "This 'text-based approach to statutory construction requires us to study the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence.'" *Id.* (quoting *Creative Oil & Gas, LLC*, 591 S.W.3d at 133 (quoting *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014))).

Here, Lessors argue that the counterclaims addressed in the TCPA motion are based on their "[e]xercise of the right to petition," which is defined under the TCPA to include "a communication in or pertaining to . . . a judicial proceeding" or "a communication in connection with an issue under consideration or review by a . . . judicial . . . body." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i), (B). A "communication" is defined to include "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1). "[D]ismissal under the TCPA is determined not by the action as a whole but on a claim-by-claim basis." *Republic Tavern & Music Hall, LLC v. Laurenzo's Midtown Mgmt., LLC*, No. 14-19-00731-CV, 2020 WL 7626253, at *2 (Tex. App.—Houston [14th Dist.] Dec. 22, 2020, no pet.) (mem. op.)

14

(quoting *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 72 n.19 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)).

Lessees' pleadings reveal two sets of communications at issue in this case. The first involves the direct statements, including "verbal[] . . . accusations to prospective buyers," that Howard made to third parties, as shown by his own deposition testimony, and the second involves the communications made in or about the lawsuit and lis pendens.

## III.     The TCPA Does Not Apply to Howard's Direct Statements to Third Parties

Howard's deposition showed the following direct statements to third parties that fall into the first category, including (1) communications with Trice and Brown resulting in a consensus that Cherry was "nothing but a fraud and deserved to be sued"; (2) communications with Brown and Palmer that Cherry "just [didn't] get it"; (3) communications with other companies and "other people" about leasing Lessors' minerals because "[they knew] Cherry [was] not going to do anything"; (4) pre-suit communications between Howard and NextEra related to NextEra's interest in the lease; and (5) communications between Howard and Abel related to Lessors' and Rockcliff's interest in the lease.

To succeed on their dismissal motion, Lessors were required to first "prove by a preponderance of the evidence" that Lessees' claims were "based on or [were] in response to" their exercise of the right to petition. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003; *BusPatrol Am.*, 2020 WL 1430357, at *4. This is because "[t]he 'exercise of the right to petition' requires a communication that pertains to governmental or at a minimum, public, proceedings." *Kawcak v. Antero Res. Corp.*, 582 S.W.3d 566, 579 (Tex. App.—Fort Worth 2019, pet. denied) (quoting

15

TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)–(E)); *see BusPatrol Am.*, 2020 WL 1430357, at *8 (same); *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 474 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (same). "[T]the ordinary meaning of 'judicial proceeding' is an actual, pending proceeding and the TCPA's use of the phrase 'pertaining to' does not expand the ordinary meaning of 'judicial proceeding' to include anticipated or potential future proceedings." *Casey on Behalf of Est. of Glover v. Stevens*, 601 S.W.3d 919, 927 (Tex. App.—Amarillo 2020, no pet.) (quoting *Levatino v. Apple Tree Café Touring, Inc.*, 486 S.W.3d 724, 728–29 (Tex. App.—Dallas 2016, pet. denied)) (citing *QTAT BPO Sols., Inc. v. Lee & Murphy Law Firm, G.P.*, 524 S.W.3d 770, 777–78 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (finding "that pre-suit communications between a client and its lawyers were not communications in or about a judicial proceeding because no judicial proceeding had been initiated at the time of the communications")).

A review of the direct communications to third parties reveals that they do not mention or involve the filing of the lawsuit or lis pendens. Howard's direct communications to third parties were neither made in a judicial proceeding nor pertained to a judicial proceeding. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i). His pre-suit communications were not communications that were currently "under consideration or review by a . . . judicial . . . body." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(B). As a result, we find that the trial court correctly ruled that, with respect to direct communications to third parties, Lessors failed to meet their burden to show that the counterclaims addressed in the TCPA dismissal motion were based on or were in response to an exercise of the right to petition. *See Viswanathan v. Kim*, No. 14-

16

19-00255-CV, 2021 WL 865189, at *4 (Tex. App.—Houston [14th Dist.] Mar. 9, 2021, no pet. h.) (mem. op.) (citing *Republic Tavern & Music Hall, LLC*, 2020 WL 7626253, at *4); *Serafine v. Blunt*, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.).

We overrule Lessors' points of error related to the denial of the TCPA motion for counterclaims that were based on Howard's direct communications to third parties because the TCPA did not apply.

## IV.    Communications in or About the Lawsuit or Lis Pendens

### A.    The TCPA Does Not Apply to Lessees' Breach of Contract Counterclaim

Next, Lessors argue that the trial court erred in failing to dismiss Lessees' breach of contract claim because it alleged that Lessors breached paragraph 9 of the Lease Agreement by filing this lawsuit and that the filing of the lawsuit constituted a communication in a judicial proceeding.  Because Lessors contractually limited their right to petition, we disagree.

Paragraph 9 of the Lease Agreement required Lessors to provide Lessees with sixty days' pre-suit notice "setting out specifically in what respects lessee ha[d] breached th[e] contract," which would then trigger a sixty-day opportunity to "meet or commence to meet all or any part of the breaches alleged by lessor."  Paragraph 9 provided that the "notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee."  By agreeing to this provision, Lessors "contractually restricted [their] normally unrestricted constitutional right to petition." *Judwin Props. Inc. v. Lewis*, 615 S.W.3d 338, 346–47 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing *Lona Hills Ranch, LLC v. Creative Oil & Gas Operating, LLC*, 549

17

S.W.3d 839, 848 (Tex. App.—Austin 2018), *rev'd on other grounds*, 591 S.W.3d at 127) (holding that the TCPA did not apply because Lessors contractually restricted their right to petition by agreeing to provision stating, "No litigation shall be initiated by [Lessor] with respect to any alleged breach or default by Lessee hereunder, for a period of at least ninety (90) days after [the Lessor] has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy or commence to remedy the breach or default within such period.") (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding)).

As in *Judwin* and *Lona Hills Ranch*, Lessors cannot establish that Lessees' breach of contract counterclaim is factually predicated on the exercise of a right to petition because Lessors agreed to limit their ability to commence litigation, which resulted in "limited waiver of certain of [their] TCPA remedies." *Id.* at 347; *see Lona Hills Ranch*, 549 S.W.3d at 848.[4] As a result, we find that the trial court did not err in denying Lessors' motion to dismiss Lessees' breach of contract counterclaim because the TCPA did not apply. *See Judwin Properties Inc.*, 615 S.W.3d at 347; *see Lona Hills Ranch*, 549 S.W.3d at 848.

### B. The TCPA Applies to Lessors' Remaining Counterclaims Based on Communications in or About the Lawsuit or Lis Pendens

Lessees asserted a counterclaim for tortious interference with the Sales Agreement Matterhorn executed on September 9 with EnergyNet. Lessees complained that Lessors conduct "to terminate the subject lease" and "the wrongful filing of the Lis Pendens" "caused third

---

[4]Lessors rely on *AKOE, LLC v. RJ Machine Inc.*, No. 03-19-00491-CV, 2020 WL 5099960, at *3 (Tex. App.—Austin Aug. 26, 2020, no pet.) (mem. op.), to argue that they did not contractually limit their right to petition. Because *Akoe* only involved limits on the rights of free speech and association, not the right to petition, that case is inapplicable.

parties to withdraw their interest despite EnergyNet's marketing attempts" and forced the termination of the Sales Agreement. Lessees also asserted that Lessors' interfering conduct, which fairly subsumes the filing of the petition and lis pendens, caused tortious interference with prospective relations with "potential third-party purchasers" and that the lis pendens wrongfully "published false and disparaging information" because no question of title to real property was involved.

The "[e]xercise of the right to petition" includes a "communication in or pertaining to . . . a judicial proceeding" and a "communication in connection with an issue under consideration or review by a . . . judicial . . . body." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i), (4)(B). As a result, Lessors met their burden to show that the portions of the tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement counterclaims that complained of Lessors' filing of the lawsuit and lis pendens were based on their exercise of the right to petition. *See Martin v. Bravenec*, No. 04-14-00483-CV, 2015 WL 2255139, at *6 (Tex. App.—San Antonio May 13, 2015, pet. denied) (mem. op.) (citing *James v. Calkins*, 446 S.W.3d 135, 147–48 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("holding filing of notice of lis pendens and pleadings in lawsuit are communication in or pertaining to a judicial proceeding and lawsuit alleging claims based on those actions related to exercise of right to petition"); *see also Serafine*, 466 S.W.3d at 360.[5]

---

[5]Lessees argue that the commercial speech exception to the TCPA applies to this case. We disagree. The commercial speech exemption in the TCPA applies when:

> (1) the defendant was primarily engaged in the business of selling or leasing goods, (2) the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services, (3) the statement or conduct at

19

## C. The Judicial Proceedings Privilege Bars the Remaining Counterclaims

Because Lessors met their initial burden, the burden shifted to Lessees to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *see ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam). We would typically undertake a full analysis to determine whether Lessees met this burden but decline to do so here because (1) those same counterclaims related to direct communications to third parties were not covered by the TCPA and remain pending and (2) the record showed that discovery designed to develop the essential elements of those counterclaims was still ongoing. As a result, we will assume, without deciding, that Lessees met their burden to make a prima facie case and move to the question of whether Lessors established an affirmative defense or other ground that entitled them to judgment as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).

Lessors plead the affirmative defense of the judicial proceedings privilege, which can be addressed in the context of a TCPA proceeding to show that a valid defense has been established. *See Marble Ridge Capital LP v. Neiman Marcus Grp., Inc.*, No. 05-19-00443-CV, 2020 WL 5814487, at *12 (Tex. App.—Dallas Sept. 30, 2020, pet. filed) (mem. op.). "Under the judicial-proceedings privilege, '[c]ommunications in the due course of a judicial proceeding will not

---

issue arose out of a commercial transaction involving the kind of goods or services the defendant provides, and (4) the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018) (per curiam); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). Lessees, who had the burden to prove the statutory exception, admitted that "the oil and gas was not extracted in the instant case" and cite no authority supporting that unsevered mineral interests are either goods or services. *ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 836 (Tex. App.—Eastland 2019, pet. denied).

serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made.'" *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 57 (Tex. App.—Houston [14th Dist.] 2018, pet. granted) (quoting *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex. 1982) (per curiam)); *see Waller v. Waller*, No. 12-19-00226-CV, 2020 WL 3026342, at *9 (Tex. App.—Tyler June 5, 2020, no pet.) (mem. op.); *Rossa v. Mahaffey*, 594 S.W.3d 618, 628 (Tex. App.—Eastland 2019, no pet.); *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 285 (Tex. App.—Dallas 2015, pet. denied) ("Any communication, even perjured testimony, made in the course of a judicial proceeding, cannot serve as the basis for a suit in tort."). "The [judicial] privilege afforded against defamation actions is founded on the 'theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual.'" *Tex. Mut. Ins. Co. v. Ray Ferguson Interests, Inc.*, No. 01-02-00807-CV, 2006 WL 648834, at *9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2006, pet. denied) (mem. op.) (quoting *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994)). As a result, courts have also applied this privilege to other torts, like business-disparagement and tortious-interference claims, when those claims are predicated on an allegedly defamatory act. *Landry's*, 566 S.W.3d at 63 (citing *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Because the underlying activity at issue in this case is not tortious given the absence of defamatory statements of fact about *Rehak*, the tag-along tort claims predicated on the same website content also fail."), *disappr'd on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) (orig. proceeding)); *see Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 690 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("when the

21

essence of a claim is damages that flow from communications made in the course of a judicial proceeding" and the "party seeks damages that flow from alleged reputational harm, regardless of the type of claim alleged," the judicial proceedings privilege applies).  The privilege is "'more properly thought of as an immunity' from a claim that contains allegations of reputational harm from a communication in a judicial proceeding." *Rossa*, 594 S.W.3d at 628 (quoting *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015)).

Here, Lessees remaining counterclaims for tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement claims all complain of Lessors' communications in their petition and the lis pendens.  Lessors' petition is a communication in a judicial proceeding.  Also, a lis pendens, which "provides a mechanism for putting the public on notice of certain categories of litigation involving real property," is subject to the judicial proceedings privilege. *Jetall Cos., Inc. v. Van Dyke*, No. 14-19-00104-CV, 2019 WL 2097540, at *5 (Tex. App.—Houston [14th Dist.] May 14, 2019, no pet.) (mem. op.) (citing *In re Miller*, 433 S.W.3d 82, 84 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding).  This is because "(1) a lis pendens . . . has no existence separate from the litigation of which it gives notice . . . and (2) the open courts guarantee of the Texas Constitution ensures litigants access to the courts without fear of defamation actions." *Cty. Inv., LP v. Royal W. Inv., LLC*, 513 S.W.3d 575, 579 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Where a theory of damages on a claim is based on abandonment of business relations because of allegations and assertions in judicial proceedings, the judicial proceedings privilege will apply to bar that claim "regardless of the label placed on the claim." *Tex. Mut. Ins. Co. v.*

*Ray Ferguson Interests, Inc.*, No. 01-02-00807-CV, 2006 WL 648834, at \*9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2006, pet. denied) (mem. op.) (quoting *Crain v. Unauthorized Practice of Law Comm.*, 11 S.W.3d 328, 335 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)). Although Lessees did not specifically allege a defamation claim, they alleged that the filing of the lawsuit and wrongful lis pendens caused third parties to withdraw their interest from the EnergyNet data room, which resulted in the termination of the Sales Agreements, and caused business disparagement that encumbered Matterhorn's lease and "precluded the potential economic benefit derived from the sale of the mineral interests."[6] Farrar's affidavit also established that damages flowed from the filing of the lawsuit and lis pendens, which third parties would see when completing due diligence on Matterhorn's lease offering. Thus, Lessees' claims for damages stem from slander of title based on the filing of the lis pendens and allegedly false statements made in Lessors' petition. Because "[t]he crux of the claims is that the lis pendens was unlawful . . . and the lis pendens . . . caused [the party] to lose the [money] it would have realized from the sale of the property," the judicial proceedings privilege bars the claims. *Cty. Inv., LP*, 513 S.W.3d at 577. Also, "[t]here is an absolute privilege [defense] against a suit seeking damages for placing a lis pendens even when the plaintiff alleges the lis pendens was wrongful as falling outside the circumstances for which a lis pendens may be filed under section 12.007(a)." *Jetall Cos.*, 2019 WL 2097540, at \*6 (citing *Prappas v. Meyerland Cmty. Improvement Ass'n*, 795 S.W.2d 794, 795 (Tex. App.—Houston [14th Dist.] 1990, writ

---

[6]Lessees did not introduce any evidence of separate contract damages flowing from the termination of the Sales Agreement.

denied)).[7]  This is because the "availability of the privilege does not turn on whether the party placing the lis pendens acted in good faith and even malice would not dissolve the privilege." *Cty. Inv., LP*, 513 S.W.3d at 581.

In sum, we conclude that Lessors established that the judicial proceedings privilege barred the remaining counterclaims based on the filing of the lawsuit and lis pendens as a matter of law.  As a result, the trial court should have granted the TCPA dismissal on these claims.

## V.    Conclusion

We reverse the portion of the trial court's judgment that failed to dismiss Lessees' tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement claims based on communications made in Lessors' petition and lis pendens.  We affirm the denial of Lessors' TCPA motion to dismiss Lessees' breach of contract claim and the tortious interference with an existing contract, tortious interference with prospective business relations, and business disparagement claims based on communications directly made to third parties.  We remand the case to the trial court for further proceedings consistent with this opinion.

Scott E. Stevens
Justice

Date Submitted:    March 31, 2021
Date Decided:     May 4, 2021

---

[7]The application of the privilege does not preclude remedies available under Chapter 12 of the Texas Property Code. *See id.*

24